UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

KATHLEEN ELAINE PETHTEL, *et al.*,     )
                                        )
            Plaintiffs,                 )
                                        )
v.                                      )     No.:   3:10-CV-469-TAV-HBG
                                        )
STATE OF TENNESSEE DEPARTMENT          )
OF CHILDREN SERVICES, *et al.*,         )
                                        )
            Defendants.                 )

## MEMORANDUM OPINION AND ORDER

Defendants State of Tennessee Department of Children's Services, District Attorney General David Clark, Clinch Valley Children's Center, Foothills Care, Inc., Solution Source, Omni Vision, Shannon Forrester, Helen Burleson, Katie Butler, Cynthia Koehler, Samantha Cardwell, Erin Schad, Sean Morehead, Julie Rotella, Pamela Becker, Margaret Durgin, Gail Clift, Stephanie Huckabey, Jay Huckabey, Hazel Bumgardner, Martha Ruff, Stephen Ruff, Kimbra McKinley, Ryan Peters, Stacey Pratt, Leigh Anne Goldstine, Stella Hamilton, Anderson County Health Department, Pediadvocates, Heather Poster, and Terry Ryan have moved to dismiss plaintiffs' claims against them for various reasons [Docs. 213, 215, 233, 257, 282, 284, 286].  All of plaintiffs' claims against these defendants must be dismissed, and the Court will therefore **GRANT** defendants' motions.  The additional motions by dismissed parties and plaintiffs' motions related to those parties [Docs. 291, 292, 294, 303, 304] will be **DISMISSED** as moot.  Plaintiffs have moved for leave to amend the complaint [Doc. 297], which for the reasons discussed below, will be **DENIED**.

## I.    Background

Plaintiffs in this civil rights action have sued forty-five (45) defendants, forty-two (42) of whom remain,[1] seeking compensatory and punitive damages, as well as injunctive relief [Doc. 6 ¶¶ 538–44].  Plaintiffs' 114-page complaint[2] contains 544 paragraphs, many of which include multiple subparts [*Id.*].  Plaintiffs assert various claims, including claims under § 1983 for violations of the First, Second, Fourth, and Fourteenth Amendments to the United States Constitution; § 1985 for conspiracy to commit § 1983 violations; the Adoption Assistance and Child Welfare Act as amended by the Adoption and Safe Families Act of 1997; the Americans with Disabilities Act; the Tennessee Constitution; Tenn. Code Ann. §§ 29-24-101 to -104 (libel and slander); Tenn. Code Ann. § 39-13-101 (asserting negligence per se pursuant to the penal statute for assault); and the common law (intentional infliction of emotional distress, negligence, and invasion of privacy) in addition to claims asserting violations of the Tennessee Department of Children's Services' policies and the Brian A. Settlement Agreement [Doc. 6 ¶¶ 330–531].

Due to the lengthy nature of the factual background and complaint in this case, details of relevant allegations and facts will be addressed as needed.  As a brief overview,[3] plaintiffs Tobias and Kathleen Pethtel adopted seven (7) minor children [Doc. 6 ¶ 1].  One

---

[1.] The Court dismissed Anderson County Sheriff's Department and Drs. Palmer and Radu [Docs. 253, 319].

[2] "Complaint" is used herein to refer to Document 6, the plaintiffs' amended complaint filed in March of 2011.

[3] For the purpose of a motion to dismiss, the Court takes all the factual allegations in the complaint as true.  *Papasan v. Allain*, 478 U.S. 265 (1986).

2

of the minor Pethtel children made a 911 prank call on November 10, 2009, which drew officers from the Anderson County Sheriff's Department to the Pethtel home [*Id.* ¶¶ 2–3]. Some of the deputies reportedly saw a bruise on the face of one of the children, which the child explained as a bruise from a bicycle accident [*Id.* ¶ 5]. The deputies called the State of Tennessee Department of Children's Services ("DCS") to the plaintiffs' home [*Id.*]. That same day, after some investigation, six (6) of the minor children were removed from the home and placed in two (2) different homes [*Id.* ¶ 13]. DCS also removed the seventh minor child from military school in Florida [*Id.*]. DCS, through defendant Koehler, filed a Petition for Dependency and Neglect and a Protective Custody Order in the Anderson County Juvenile Court, alleging the Pethtel children were neglected [*Id.* ¶ 15]. The plaintiff parents were later found guilty of one count of misdemeanor child abuse in Anderson County criminal court and sentenced; they filed a waiver of the right to appeal and right to a new trial [Doc. 206 p. 2; Doc. 220-1].

All of plaintiffs' claims arise out of this law enforcement visit to the home of plaintiffs and ensuing actions by local law enforcement, DCS, and other individuals and agencies named in the complaint for their treatment of plaintiffs and involvement in plaintiffs' familial relationships.

## II.    Motions to Dismiss

### A.    Legal Standard

Many defendants have brought motions to dismiss pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6). Federal Rule of Civil Procedure 8(a) sets out a liberal

pleading standard. To survive a motion to dismiss, a complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief, 'in order to give [the opposing party] fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). This is to "avoid situations . . . wherein the pleading is so verbose that the Court cannot identify with clarity the claim(s) of the pleader and adjudicate such claim(s) understandingly on the merits." *Harrell v. Directors of Bureau of Narcotics & Dangerous Drugs*, 70 F.R.D. 444, 446 (E.D. Tenn. 1975). Detailed factual allegations are not required, but a party's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." *Id.* (internal quotations omitted). "[A] formulaic recitation of the elements of a cause of action will not do," nor will "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In deciding a Rule 12(b)(6) motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, draw all reasonable inferences in favor of the plaintiff, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citation omitted). This assumption of factual veracity, however, does not extend to bare assertions of legal conclusions, *Iqbal*, 556 U.S. at 679, nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

4

"A claim has facial plausibility when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires th[is Court] to draw on its judicial experience and common sense." *Id.* at 679.

The Court will evaluate defendants' motions pursuant to these standards.

## B. Analysis

### 1. Introduction and Approach

Due to the defendants' general confusion regarding what claims plaintiffs allege against whom,[4] and the varied organization of claims across the defendants' motions, the Court will discuss its approach in addressing the various motions to dismiss in this case and its analysis of the complaint.

_____

[4] As defendants Solution Source, McKinley, and Peters state in their briefing, "[i]t is confusingly unclear from the Amended Complaint to whom many of these allegations are directed . . . . Ambiguity is heaped upon ambiguity" [Doc. 216 p. 5–6]. On behalf of the Clinch Valley Defendants:

> To highlight the point, and as detailed below, the Clinch Valley Defendants, in drafting the instant Motion, were forced to resort to a chart provided by Plaintiffs in their Response to the State Defendants' original Motion to Dismiss, which outlined Plaintiffs' claims and their respective defendants, in order to gain some clarity as to the claims Plaintiffs purport to bring against the Clinch Valley Defendants. In short, neither Clinch Valley Defendants nor the other 42 defendants have 'fair notice of what the . . . claim is and the grounds upon which it rests.' *See F.R.P. Grp.*, 657 F. Supp. at 966-67

[Doc. 283 p. 15]. Defendants Foothills, Goldstine, and Hamilton stated that they made a "good faith attempt to address each claim" due to the confusion in matching facts with lists of elements in the complaint [Doc. 233 p. 3]. Defendant Clift said she "will assume that the Plaintiffs intend to allege all such theories of liability as to her" and briefed more claims than the complaint supports [Doc. 285 p. 2].

5

The Court has conducted an extensive and careful review of the complaint, construing it in the light most favorable to the plaintiff. However, even under this standard, the complaint is deficient in many areas, particularly in its specificity with which it alleges claims against the many defendants. To attempt to clarify matters, in response to the state defendants'[5] first motion to dismiss [Doc. 121], plaintiffs filed a claim chart with "many of the state defendants and many of the causes of action against them" [Doc. 140. p. 18; Doc. 141-1]. This chart is a word document "not meant as an exhaustive list of all claims or defendants" that places an X where plaintiffs assert they alleged a claim for the claims in each column against defendants in each row [Doc. 140-1 p. 4].

Plaintiffs' complaint is structured with many factual or "general" allegations at the beginning, and then, beginning on page fifty-nine (59), puts together the elements of claims and begins their substantive legal counts.[6] However, plaintiffs' chart sometimes includes claims against persons not at all mentioned in the legal claims of the complaint. The complaint often states "defendants" took particular actions, with no indication as to which of the forty-five (45) defendants plaintiffs are referring. Plaintiffs state in their response to defendants Goldstine, Hamilton, and Foothills Care, Inc.'s motion that "defendants" refers

---

[5] "State defendants" as used herein refers to those defendants included in State Defendants' Motion to Dismiss Amended Complaint [Doc. 257], that is: Anderson County Health Department, Pamela Becker, Hazel Bumgardner, Helen Burleson, Katie Butler, Samantha Cardwell, David Clark, Shannon Forrester, Jay Huckabey, Stephanie Huckabey, Cynthia Koehler, Sean Morehead, Heather Poster, Julie Rotella, Martha Ruff, Stephen Ruff, Terry Ryan, Erin Schad, and DCS.

[6] References in this opinion to the legal or substantive claims or counts refer to the portions of the complaint from page fifty-nine (59) onward that allege the elements of the causes of action or state the claims or counts.

6

to all defendants because repeating all defendants' names would have made the complaint too lengthy [Doc. 247 p. 2]. However, plaintiffs did not define the term "defendants" to refer to all defendants in the complaint.[7] Additionally, plaintiffs use the term "defendants" to refer to various groupings. Thus, "defendants" is not used consistently such that the Court or parties could deduce plaintiffs' definition. Sometimes, plaintiffs make statements like, "these defendants and their employer agencies," or "defendants herein are employees of the State of Tennessee Department of Children's Services, the Anderson County Sheriff's Department, Anderson County Health Department, Clinch Valley Children's Center, Omni Visions, Solution Source, CASA of Anderson County, and Foothills Care, Inc., Pediadvocates" when the agencies themselves and employers listed are also defendants [Doc. 6 ¶¶ 313, 333]. Plaintiffs use the terms "state-actor Defendants, private Defendants and the private agencies employing Defendants" in addition to "defendant agencies" [*Id.* at ¶¶ 334, 342]. Such issues could have been avoided had plaintiffs used more specific wording, defined the term "defendants," or simply stated "all defendants" instead of just "defendants."

---

[7] Plaintiffs also use "state actors" as a term without clearly defining it. For example, in paragraph 350, plaintiffs state many defendants "were state actors within the meaning of 42 U.S.C. § 1983" [Doc. 6]. This however does not specify a definition that "state actor" as used in the complaint will be defined as those defendants but is an allegation toward listing the elements of a § 1983 claim. The later claims that "state actors seized" the plaintiffs and "state actors performed an intrusive and intimate medical search" are vague because "state actors" is not a defined term [Doc. 6 ¶ 352(f)(4)]. Additionally, this follows the same problem as the general use of "defendants" as not all defendants have performed such action, and state actors could thus not possibly refer to all listed state actors.

7

Additionally, plaintiffs make statements like "Defendant's actions had no valid secular purpose" [*Id.* ¶ 458], "Defendants have censored Plaintiffs from expressing their religious beliefs" [*Id.* ¶ 455], and "The Defendants acted as to the Plaintiffs, with conduct a reasonable person would describe as extreme and outrageous" [*Id.* ¶ 380]. Such statements could not possibly refer to all defendants, as each defendant's alleged involvement in the large number of events giving rise to this case is unique. Additionally, plaintiffs do not properly allege that all defendants are involved for all counts under the complaint. Plaintiffs' assertion that "defendants" indicates all defendants is also inconsistent with their claim chart. If the use of the word "defendants" refers to all defendants in paragraphs 458 and 455 of the complaint, their claim chart would include an X for the first amendment column as to all defendants. It does not.

Plaintiffs' statement that "defendants" refers to all defendants is also contradicted by its usage in the complaint to refer to any number of defendants, either specifically listed as individuals or in varied groupings. Their argument is further belied by the complaint in one instance, clarifying that "defendants" refers to all: "The Defendants, *each of them*, acted with conduct to the Plaintiffs which was callously indifferent and so reckless as to demonstrate a substantial lack of concern for whether an injury resulted" [Doc. 6 ¶ 394 (emphasis added)]. This gives rise to the implication that in the other instances, where it is not so clarified, that "defendants" means something different.

When internal references to a previous specification of defendants are in close enough proximity to later use of the general term "defendants," it may be inferred the

8

definition is the same.  However, plaintiffs rely heavily on some variant of the phrase the "general allegations [preceding the current section are repeated] as if fully set forth herein" [S*ee, e.g.*, Doc. 6 ¶ 355].  This incorporation of facts into the substantive claims does not place the factual allegations as to specific defendants in close enough proximity to the vague use of "defendants" later on to allow the Court or defendants to infer which defendants are referenced.  This is especially true in light of plaintiffs' association of various claims and violations with specific defendants in some instances.  When there are particular defendants listed as to the claims and counts, those who are unlisted cannot be considered to have notice of claims against them just because facts regarding statements said or actions taken had been previously alleged.

Additionally, plaintiffs use the passive voice after having referred to a variety of defendants for separate events:  "The Pethtel children were allowed to watch movies with sexually explicit and graphically violent material. . . . The Pethtel children were allowed to wear immodest clothing, such as bikinis, miniskirts, and padded bras when bras were not even necessary.  The Pethtel children were allowed to look at magazines and were intrigued by photos of scantily clad people" [Doc 6. ¶¶ 434–36].  The complaint neither directly, nor through context or inference, indicates which defendants made these allowances.

The complaint must be more than a "the-defendant-unlawfully-harmed-me accusation" *Iqbal*, 556 U.S. at 678.  To state only facts and later to assert claims against other defendants or to "defendants" with no further specificity is akin to such an accusation.  Such a bare-bones complaint does not allow the parties or the Court to make the inference

connecting general discussion about all defendants to the acts previously outlined in the facts.  It is not enough that plaintiffs allege facts with the possibility of misconduct, actionable if properly pled.

As defendants Foothills, Goldstine, and Hamilton stated, "[i]nstead of supporting certain causes of action with specific facts, the Amended Complaint alleges the facts within the General Allegations section and then simply pleads the elements of each cause of action, leaving it to the Defendants and the Court to determine which facts support each cause of action" [Doc. 233 p. 3].  This structure of the complaint, unless otherwise specified as to which defendants are matched with a cause of action, does not meet "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' [which] requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 545.

In many instances, plaintiffs emphasize the length of the complaint and their inclusion of many facts.  Plaintiffs appear to argue that because the Rules do not require detailed facts to state a claim, the complaint must be sufficient to survive a motion to dismiss given its lengthy listing of factual allegations.  Plaintiffs state, "Under Rule 12(b)(6), a party can move to dismiss a complaint based on the fact that the complaint either alleges a cause of action that does not exist, or a cause of action that has a factual defect.  Basically, the idea is that under no set of facts would the complaining party be entitled to a judgement" [Doc. 250 p. 5].  Their focus is that Rule 8 does not require "detailed factual allegations" to support a claim.  *Iqbal*, 556 U.S. at 678.  However, the

issue here is that plaintiffs have alleged many facts and asserted many claims, but the complaint provides no connection between the two.

*Twombly* held that the party must have "fair notice of what the . . . claim is and the grounds upon which it rests." 550 U.S. at 555. Plaintiffs' focus on the facts speaks to the *second* part of Twombly, the "grounds" upon which the claim rests. Their focus on the sufficiency of the facts assumes a claim has been properly alleged as to specific defendants and that the inquiry is whether such a claim has been supported. The deficiency at issue is not the supportive facts, but the fair notice of what the claim is. Plaintiffs have "failed to allege with any degree of specificity which of the named defendants were personally involved in or responsible for each of the alleged violations of [their] federal rights." *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002). The vagueness and lack of specificity has created a disconnect between the facts and claims that is insufficient to put unspecified defendants on notice.

All of these considerations combine together to create added difficulties on the part of any reader to determine what claims are being alleged against whom. For the reasons set forth above, the complaint is insufficient to allege claims as to many defendants. Defendants need not perform such logical gymnastics to determine what has been alleged against them, nor should the Court be required to do so. As a result, and in this opinion, the Court therefore does not purport to affirmatively state all claims properly alleged against each party but takes the following approach.

11

The opinion first addresses several claims as to all relevant parties. Next, the Court addresses a few parties as to all claims. Third, the opinion addresses the § 1983 claims. The § 1983 claims are discussed first on two (2) theories as to all relevant parties and then party by party as the issues become more specific. Finally, because the Court has dismissed all federal claims, it declines to exercise supplemental jurisdiction over the remaining state claims. Parties are discussed in roughly the groupings in which they filed their motions or have been grouped together by the Court because of similar legal issues. In this opinion, references to "defendants," unless otherwise stated, means the defendants who have filed motions to dismiss presently before the Court and who are being addressed in that section heading. The same applies with qualifiers like "only"; for example, to say there is only one claim remaining means one claim as to the defendants addressed in that section.

The Court herein explicitly addresses all arguably viable claims. By negative inference, some claims are not addressed because either a party has been dismissed in its entirety for another reason, or the claim as alleged in the claim chart, response to a motion, or otherwise are hereby dismissed as insufficient to state a claim as to other defendants for the reasons explained above. Some parties took guesses as to what claims were alleged against them and briefed all claims to ensure they had covered the appropriate material. The Court finds it unnecessary to address and dismiss each claim specifically when it was briefed out of an abundance of caution and unsupported by the complaint.

### 2. Americans with Disabilities Act

12

In the section of the complaint titled "ADA Title II: State and Local Government Activities," plaintiffs state "Defendants violated the Plaintiff's M.P.'s ADA rights as follows below" and proceed to mention defendants DCS, Cindy Koehler, and foster parents Martha and Stephen Ruff [Doc. 6, ¶¶ 526–31].

Title II of the ADA prohibits public entities from discriminating against disabled individuals, stating "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A public entity is defined as "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)–(B). Accordingly, the "proper defendant is that 'entity.'" *Williams v. McLemore*, 247 F. App'x 1, 8 (6th Cir. 2007). However, DCS, a public entity as a department of Tennessee, is dismissed from the case, as discussed in Part II.B.7. And the claims as to Koehler and the Ruffs must be dismissed because the ADA applies to employers, places of public accommodation, and organizations and therefore "does not permit public employees or supervisors to be sued in their individual capacities." *Williams v. McLemore*, 247 F. App'x 1, 8 (6th Cir. 2007); s*ee Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804, 808 n.1 (6th Cir.1999); *Walker v. Snyder*, 213 F.3d 344, 346 (7th Cir. 2000).

Especially in light of plaintiffs' association of this count with specific defendants in the complaint, plaintiffs' statement that they "incorporate by reference the allegations

13

contained in [all preceding sections of the complaint]" [Doc. 6 ¶ 526] and general statement that "Defendants violated the Plaintiff's . . . ADA rights" [*Id.* ¶ 527] fails to give other defendants "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Because DCS, Koehler, and the Ruffs are the only defendants specifically mentioned, DCS has immunity, and the others are sued in their individual capacities [Doc. 6, Parties, ¶¶ 22, 33, 34], all ADA claims must be **DISMISSED**.

### 3. Adoption Assistance and Child Welfare Act as amended by the Adoption and Safe Families Act of 1997

Plaintiffs seek relief under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. § 670 *et seq.* (collectively "ASFA").[8] They allege that a petition for termination of their parental rights was filed prior to their conviction and before a judicial determination that reasonable efforts to reunify the family were unnecessary [Doc. 6 ¶ 485–90], contrary to the requirements found in 42 U.S.C. § 671(a)(15).

Plaintiffs do not assert a valid claim under the ASFA because the statute does not provide a private right of action. Indeed, this statute explicitly states, and the Supreme Court has held, that it does not provide a private right of action. 42 U.S.C. § 1320a-2

---

[8] The amended complaint refers to the "Family Safe Act of 2003," but the quoted portions are ASFA provisions. *Compare* [Doc. ¶ 486], *with* Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, § 401, 111 Stat. 2115, 2133–34, *and* Keeping Children and Families Safe Act of 2003, Pub. L. No. 108-36, 117 Stat. 800 (a federal law regarding victims of domestic violence). Additionally, plaintiffs allege violations of the "Child Welfare Act of America" without citing any specific statutory provision [Doc. 6 ¶¶ 517–22]. To the extent this is a reference to the Adoption Assistance and Child Welfare Act of 1980, it is part of the ASFA as presently amended.

14

("[S]ection 671(a)(15) of this title is not enforceable in a private right of action."); *Suter v. Artist M.*, 503 U.S. 347, 364 (1992) ("Congress did not intend to create a private remedy for enforcement of the 'reasonable efforts' clause."). Therefore, all claims under the ASFA must be **DISMISSED**.

### 4. Brian A. Settlement Agreement

The complaint includes a section entitled "Violations Against Principles of the Brian A. Settlement Agreement" [Doc. 6 ¶¶ 491–516]. Plaintiffs do not identify the version of the settlement agreement to which they refer, but the state defendants included the January 2009 Modified Settlement Agreement as an attachment to their original motion to dismiss [Doc. 122-3]. Plaintiffs restate twelve (12) of the fourteen (14) guiding principles of the settlement agreement and allege ways in which various state defendants violated such principles. After the list of principles, the settlement agreement lists many action steps and standards with metrics to measure compliance during the monitoring process. Plaintiffs do not allege failure to comply with any of the specific terms of the settlement agreement. Instead, they argue state defendants violated the spirit of the rules.

The settlement agreement also contains provisions on enforcement of the agreement, which plaintiffs do not follow. While "[a]ll of the provisions in this Settlement Agreement are separately and independently enforceable, as set forth in this Settlement Agreement," "Plaintiffs agree not to seek judicial relief for isolated, technical, or de minimis, violations . . . or for violations relating solely to an individual child [other than a named plaintiff]" [Doc. 122-3 p. 56 (emphasis original)]. As plaintiffs here bring claims

15

for violations related only to their individual cases and not as to the class for broader violations, they fail to comply with the enforcement provision. Additionally, enforcement of this agreement requires that "plaintiffs shall notify the defendants in writing if they believe defendants are out of compliance with any provisions of this Settlement Agreement," and "[t]he parties shall engage in a 30 day period of good faith negotiations in an effort to resolve the non-compliance issues and shall utilize the Monitor to facilitate this process" [*Id.* at 57]. Per the terms of the agreement, plaintiffs may only bypass this process and "seek immediate relief in court if plaintiffs clearly demonstrate that DCS action or inaction in contravention of this Settlement Agreement caused or is likely to cause an immediate and substantial risk of serious harm to children in the class" [*Id.*].

Plaintiffs do not allege that they have followed these procedures, nor do they claim that they qualify for the bypass provision. Plaintiffs also offer no basis for bringing up a monitoring and compliance dispute in this court, as opposed to raising it in the original court, where the Middle District of Tennessee has "continuing jurisdiction of this action to ensure compliance with the terms of this Settlement Agreement for as long as the Settlement Agreement remains in effect" [*Id.* at 4]. While that court has since terminated jurisdiction, finding that defendants fulfilled their obligations,[9] it still had jurisdiction at the time this case was filed in 2010.

---

[9] Order Dismissing Case with Prejudice and Terminating Jurisdiction, *Brian A. v. Haslam,* No. 3:00-cv-445, Doc. 601 (M.D. Tenn. Feb. 25, 2019).

16

Plaintiffs fail to provide a legal basis for enforcement of this claim in this court. They seek to bring a claim on behalf of individuals instead of the class and otherwise fail to comply with the terms of the settlement agreement as to dispute resolution. Accordingly, they fail to state a claim under this agreement, and claims regarding the Brian A. Settlement Agreement must be **DISMISSED**.

### 5. DCS Policy

The complaint contains a section of "Violations to DCS Policy" [Doc. 6. ¶¶ 523–25], which lists various DCS policies and factual allegations related thereto. In their motion to dismiss, the state defendants argue that these claims must fail as a matter of law. The Court agrees. Plaintiffs cannot assert a § 1983 claim for violations of state policy or state law, as § 1983 only protects federally created rights. *Harrill v. Blount Cty.*, 55 F.3d 1123, 1125 (6th Cir. 1995); *Fredrickson v. Bedford Cty. Jail*, No. 4:15-CV-024-HSM-CHS, 2018 WL 1768067, at *3 (E.D. Tenn. Apr. 12, 2018) ("As claims may be brought under § 1983 only for violations of constitutional rights, however, violation of state policy is insufficient to state a claim under § 1983.") (citing *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995)).

In response, plaintiffs state that this section of the complaint does not seek to enforce DCS policies as a federal right but that these paragraphs are offered as "evidence that DCS did not treat [plaintiffs] in the manner it treats others" [Doc. 277 p. 57]. However, in the complaint itself, plaintiffs do not connect these violations of policy to claims of

17

discrimination. As these violations do not create a federally enforceable right, such claims based on violations of DCS policy are **DISMISSED**.

### 6. Section 1985

Plaintiffs attempt to bring a civil conspiracy claim under 42 U.S.C. §§ 1985(3)[10] and 1986 against many defendants. Section 1985 creates a private cause of action for conspiracy to deprive a citizen of his or her civil rights, and Section 1986 is the corresponding cause of action for aiding or abetting the conspiracy. Plaintiffs claim various defendants conspired and/or agreed to, and acted in furtherance of, a common objective with the state actors to influence the familial and parental relationships of the plaintiffs [Doc. 6 ¶¶ 359–61]. However, plaintiffs do not allege any specific facts in the context of this claim [*Id.* at ¶¶ 355–63].

To prove a claim under 42 U.S.C. § 1985(3), a plaintiff must establish:

"(1) a conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States."

*Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994). Plaintiffs must also demonstrate that the conspiracy was motivated by class-based animus. *Id.* Section 1983(3) requires intent to deprive of equal protection, meaning a showing of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the

---

[10] Although plaintiffs do not specify a claim under § 1985(3) and generally assert § 1985 claims, the first two sub-sections of § 1985 relating to preventing an officer from performing duties and obstruction of justice are inapplicable here.

18

conspirators' action;" it is not intended to apply to all tortious, conspiratorial interferences with others' rights. *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

Plaintiffs allege no facts to support class-based discrimination. Rather, the complaint alleges a narrow, private purpose as to these particular persons and relationships, not a larger class. Plaintiffs include a paragraph in the complaint tracking each of the *Johnson* elements of a § 1985 claim [Doc. 6 ¶¶ 359–62] and state as to the second element that "the common objective" of the conspiracy was "to influence the familial and parental relationships of the parents," not to deny equal protection as a result of class-based discrimination [Doc. 6 ¶ 360]. In the response to the state defendants' motion to dismiss, they claim the conspiracy is motivated by discrimination against their religion [Doc. 277 p. 49] of "Biblical Christian[ity]" [Doc. 6 ¶ 440]. But the § 1985 section of the complaint does not contain the words "discrimination" or "religion" nor does it even hint of references to religion, and plaintiffs may not amend the complaint through this response.[11] *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984). The "failure to

---

[11] "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) (citing *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F. Supp. 518, 526 (S.D.N.Y.1977)); *Sansom Comm. v. Lynn*, 366 F. Supp. 1271, 1278 (E.D. Pa. 1973); *Chambliss v. Coca-Cola Bottling Corp.*, 274 F. Supp. 401, 409 (E.D. Tenn. 1967), *aff'd on other grounds*, 414 F.2d 256 (6th Cir. 1969)); *see, e.g.*, *Muscogee Creek Indian Freedmen Bank, Inc. v. Bernhardt*, 385 F. Supp. 3d 16, 20 (D.D.C. 2019) (holding plaintiffs could not present new fact in response to motion to dismiss); *State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 573 (D. Md. 2019) (holding plaintiffs could not allege new fact in brief in opposition to motion to dismiss); *Ullery v. Raemisch*, No. 18-CV-00839-STV, 2019 WL 529570, at *12 (D. Colo. Feb. 9, 2019) (finding plaintiff could not add new claim in response to motions to dismiss).

19

establish discriminatory animus . . . dooms [the] § 1985 claim." *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 368 (6th Cir. 2012).

Plaintiffs assert in their response to the state defendants' motion that they did in fact allege discrimination in paragraphs 312 through 320 in the continuing wrongs section and that the § 1985 section "incorporates all other listed averments into the conspiracy allegations, including those that clarify discrimination based on their religion and traditional lifestyle" [Doc. 277 p. 49]. Paragraphs 312 through 320 describe discrimination "motivated by endemic animus and retaliation for the Plaintiffs not readily capitulating to Defendants' manipulative and fraudulent claims of child abuse" [Doc. 6 ¶ 319]. The complaint only contains some form of the words "discrimination" and "religion" in one paragraph of the 114 page complaint and do not allege a § 1985 conspiracy in connection with that allegation.[12] Moreover, nowhere in the relevant section of the complaint do plaintiffs point to specific instances of discrimination on the basis of religion. Instead, they state that all previous allegations are incorporated by reference as discussed and determined insufficient above in Part II.B.1. There is a complete lack of notice in the § 1985 section as to religious discrimination, and the complaint itself states a singular, distinct purpose of the conspiracy. Accordingly, defendants were not on notice of the grounds upon which the claims against them rest. *Twombly*, 550 U.S. at 555. All claims under §§ 1985 and 1986 must therefore be **DISMISSED**.

---

[12] "DCS further violated Policy 14.12 by subjecting the family to discriminatory religious remarks from the officers and DCS/CPS workers on scene" [Doc. 6 ¶ 19].

## 7. Department of Children's Services and District Attorney General David Clark

All of plaintiffs' claims against defendants DCS and District Attorney General David Clark ("General Clark") in his official capacity must be dismissed on the basis of sovereign immunity. The Eleventh Amendment bars suits against a state as well as its agencies and departments in federal court unless the state has waived immunity or Congress has abrogated it. *Papasan v. Allain*, 478 U.S. 265, 276 (1986); *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Tennessee has not waived its immunity from suit. Tenn. Code Ann. § 20-13-102(a); *Berndt v. Tennessee*, 796 F.2d 879, 881 (6th Cir. 1986) (noting the Tennessee statute impliedly extends to suits brought in federal court). Contrary to plaintiffs' assertions, Congress has not abrogated immunity in the contexts of § 1983 generally[13] and the ADA in this case.[14]

Title II of the ADA validly abrogates sovereign immunity where the underlying conduct "actually violates the Fourteenth Amendment." *United States v. Georgia*, 546

---

[13] Congress has not abrogated immunity for § 1983 claims. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989) (in passing § 1983, Congress had no intention of disturbing Eleventh Amendment immunity); *Quern v. Jordan*, 440 U.S. 332, 345 (1979) (noting § 1983 does not by clear and explicit language nor by its legislative history indicate intent to abrogate immunity).

[14] The Court need not discuss whether Congress has abrogated immunity for the AFSA, Brian A. Settlement Agreement, DCS Policy, or Section 1985 claims because they are being dismissed as to all defendants. Section 1983 is the only claim for which the analysis is defendant-specific, and immunity applies here as addressed above. The ADA claim is only properly alleged against DCS as a public entity. 42 U.S.C. § 12131(1)(A)–(B). Sovereign immunity for an ADA claim is dependent upon the merits of the claim and will be addressed in this section. *United States v. Georgia*, 546 U.S. 151, 159 (2006).

21

U.S. 151, 159 (2006).  To make this determination, the Supreme Court has created a three-part test to be applied on a case-by-case basis: a court should look at "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id*.

This claim may be resolved at the first part of the test because plaintiffs fail to identify conduct that violates the ADA.[15]  To state a claim under Title II, Part A of the ADA, a plaintiff must show she is:  "(1) disabled under the statute, (2) 'otherwise qualified' for participation in the program, and (3) being excluded from participation in, denied the benefits of, or subjected to discrimination under the program by reason of his or her disability." *S.S. v. E.K. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008).

In the complaint, plaintiffs assert M.M.P. was not provided the proper medical care [Doc. 6 ¶ 529(bb)], and in their response to the state defendants' motion to dismiss, plaintiffs assert M.M.P. was denied appropriate treatment while in the foster care program. However, plaintiffs fail to that show any of DCS's actions were by reason of her disability [Doc. 6 ¶¶  526–31].  Plaintiffs mention the following conduct on behalf of DCS: not providing the proper medical or mental health care [Doc. 6 ¶¶ 529(bb), (ee)]; accusing M.M.P. of lying about her seizures [*Id*. ¶ 529(dd)]; putting M.M.P. in a home with stairs

---

[15]    Plaintiff also has a section of the complaint alleging "Procedural Due Process Violations" as to all plaintiffs without naming any defendants [Doc. 6 ¶ 352(e)].  Such claims are insufficient as discussed in Part II.B.1.

22

when the Pethtels normally had her sleep on the ground floor [*Id.* ¶ 530(ii)]; and requiring

an alarm be put on her door as an alleged sexual perpetrator [*Id.* ¶530(jj)].[16]  None of these

actions, even taken as true, indicate differential treatment based on or because of M.M.P.'s

disability.  In fact, plaintiffs state: "M.M.P. was not provided the proper medical care by

DCS in this matter.  They were more concerned of finding her as a sexual perpetrator then

[sic] meeting her REAL medical needs of her handicap" [*Id.* ¶ 529(bb)].  Thus, plaintiffs

allege a reason for the denial of proper medical care that is wholly unrelated to the alleged

disability.

Failure to prove violative conduct under the ADA is dispositive under part one of

the *Georgia* test, and Congress has not abrogated sovereign immunity under its § 5 power

of the Fourteenth Amendment.  *Babcock v. Michigan*, 812 F.3d 531, 539 (6th Cir. 2016).

Thus, Congress has not abrogated immunity for any claims raised here.  Overall, DCS is

protected by sovereign immunity, and all claims against it must be **DISMISSED**.

General Clark is similarly protected.  Claims against state officials acting in their

official capacity are treated as suits against the state itself and are therefore barred.  *Will*,

491 U.S. at 71.  Any claim against General Clark for money damages must therefore be

dismissed.  *Thiokol Corp. v. Dep't of Treasury.*, 987 F.2d 376, 381 (6th Cir. 1993).

Plaintiffs appear to seek injunctive relief against General Clark regarding discovery

disputes in Anderson County Juvenile Court from proceedings occurring ten (10) years ago

---

[16]  In their response, plaintiffs make claims of due process violations by DCS in violation
of the ADA, citing to paragraph 529 of the complaint [Doc. 277 p. 50].  This paragraph makes no
allegations of due process violations.

23

[Doc. 6 ¶ 211–44, 543(kk)]. However, this Court lacks jurisdiction because plaintiffs fail to allege any ongoing violations of federal law. Under *Ex parte Young*, 209 U.S. 123 (1908), a federal court is not prohibited from issuing an injunction against a state official to prevent future constitutional violations and compel compliance with federal law. *Quern*, U.S. at 337. Plaintiffs here do not allege any ongoing violations, nor do they seek prospective relief as required. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). The discovery allegation is not ongoing, and the only other possible violation is plaintiffs' claim that General Clark "manipulated the Grand Jury into indicting" the Pethtels [Doc. 6 ¶ 70]. Such an allegation is not ongoing as the criminal case has concluded. Thus, the *Ex parte Young* exception does not apply, and injunctive relief is barred under the Eleventh Amendment. Because both injunctive and monetary relief are barred against this defendant, all claims against General Clark must be **DISMISSED**.

### 8. Omni Visions, Inc.

Plaintiffs assert claims against Omni Visions, Inc. ("Omni") "under the legal theory of Respondeat Superior" [Doc. 6, Parties, ¶ 18]. Foothills Care, Inc ("Foothills") is a subsidiary of Omni that is also being sued "under the legal theory of Respondeat Superior" [*Id.* ¶ 16]. Plaintiffs state in their response that they are suing Omni for: negligence, emotional distress, conspiracy, failure to properly train and monitor employees who violated plaintiffs' constitutional rights of free speech, free exercise, due process, and equal protection [Doc 238 p. 20–21]. Defendants filed a motion to dismiss for failure to state a claim [Doc. 213], plaintiffs responded [Doc. 238], and defendants replied [Doc. 241].

24

Plaintiffs have failed to state a claim against Omni upon which relief can be granted. Omni's memorandum in support of its motion correctly identifies that Omni is only mentioned in the complaint seven (7) times to state it is being sued under *respondeat superior* [Doc. 6, Parties 18], Foothills is a subsidiary [Doc. 6 ¶¶ 291, 301], Foothills and Omni are responsible for the training of their employees [*Id.* ¶¶ 292, 302], and Omni is a private person acting in collaboration and/or conspiracy with state actors or are private persons and their agencies [*Id.* ¶¶ 333, 358]. Plaintiffs do not allege any employee, agent, servant, or representative relationship between Omni and any actor for which it could be liable. The complaint expressly alleges that defendants Goldstein and Hamilton were employed by, therapists for, or representatives of Foothills, not Omni [*Id.* ¶¶ 38, 39, 64, 262, 263, 290, 300]. Liability is thus premised upon Omni's ownership of Foothills.

Plaintiffs attempt to bolster their claims against Omni in their response, adding factual allegations related to "[t]herapists," "[s]upervisors," and "employees" of Omni [Doc. 238 p. 2]. Additionally, plaintiffs now say "[t]he facts listed in the Complaints give detailed explanation as to how Omni, Foothills, and their agents Hamilton and Goldstine participated in this" action and that they "clearly claimed that Goldstine and Hamilton . . . were contracted/employed by Foothills as well as Omni," without pointing to where in the complaint such facts are alleged [*Id.* p. 9, 11]. As previously discussed in this opinion, plaintiffs may not amend the complaint through their response to a motion to dismiss. *Car Carriers, Inc.*, 745 F.2d at 1107; *see supra*, note 11.

25

Plaintiffs argue in their response that Omni "may be held liable for his or her own actions by inadequately selecting, training, or supervising such employees or volunteers if a constitutional violation occurs" and "this type of liability, at times called 'supervisory liability,' accrues against the individual government administrator, and is based on his or her personal responsibility for the constitutional violation" [Doc. 238 p. 16]. However, plaintiffs have not sued Omni for direct liability. Since plaintiffs brought their claims under a theory of vicarious liability, the claims are brought for responsibility as the employers or principals of others. Since the plaintiffs have not properly alleged direct liability and do not allege any relevant relationships for which Omni could be liable, plaintiffs have failed to state a claim.

Additionally, plaintiffs failed to state a claim to overcome the corporate separateness of Omni and Foothills. The sole allegation as to the relationship between the two (2) companies is that Foothills is a subsidiary of Omni [*Id.* ¶¶ 291, 301]. A corporation is presumed to exist separately from its shareholders, officers, and directors as a distinct entity. *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 650–51 (Tenn. 2009). Courts decline to disregard this presumption "in the absence of the parent corporation's domination of the day-to-day business decisions of the subsidiary corporation." *Id.* at 652. Neither does one being wholly owned by the parent or the fact that the two (2) have the same directors and officers suffice to qualify as alter egos. *Id.* Instead, "the presumption of corporate separateness may be overcome by demonstrating that the parent corporation exercises complete dominion over its subsidiary, not only of finances, but of policy and

26

business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own." *Id.* (quotations omitted). Here, plaintiffs do not allege that the subsidiary is a sham or dummy, that the two are alter egos, or that the subsidiary is an agent or adjunct of the parent. *Id.* at 653. They provide no basis for disregarding the presumption of corporate separateness. In their response, plaintiffs purport that a relationship exists between Omni and Foothills on the grounds that the two (2) share the same address for registered agents [Doc. 238 p. 18]. But regardless of how that may impact the analysis, this was not alleged in the complaint and may not be amended here.

Additionally, plaintiffs outline the case law and factors for piercing the corporate veil in their response but do not provide any analysis as to why it should be done in this case. They have therefore failed to overcome the presumption of corporate separateness in this case.

Because plaintiffs have not alleged a proper claim under *respondeat superior* and have not overcome the presumption that Foothills and Omni are separate entities, plaintiffs fail to state a claim upon which relief can be granted. All claims against Omni Visions are **DISMISSED**. To the extent that Omni asks for attorney's fees and costs pursuant to 42 U.S.C. § 1988, defendant's request is cursory and does not provide a basis for relief. Their request is **DENIED without prejudice** with leave to refile with necessary and appropriate fee requests and briefing.

### 9. Solution Source, LLC, Ryan Peters, and Kimbra McKinley

27

Defendants Solution Source, LLC ("Solution Source"), Ryan Peters, and Kimbra McKinley jointly filed a Motion to Dismiss [Doc. 215], plaintiffs responded [Doc. 239], and defendants replied [Doc. 243].

When given the opportunity through their response to identify which paragraphs in the complaint properly allege their desired claims against these defendants, plaintiffs repeat the strategy of taking broad strokes as to all defendants to explain the facts of the case. Plaintiffs repeat nearly the same language from their response to Omni's motion to dismiss [Doc. 238 p. 11–14] in that for defendants' motion [Doc. 240 p. 15–18]. There are a few formatting and small wording differences between the two (2) that refer to whole sections of the complaint and thus provide no clarification. Plaintiffs state, "These Defendants violated" and then lists various claims and cites to the complaint where claims are asserted as to "The Defendants" without clarification as to which specific defendants or grouping of defendants are referenced [Doc. 240 p. 16–17]. That plaintiff "asserts it has clearly set out in its Complaint the involvement of Defendants in this plot/miscarriage of justice that has been hoisted on Plaintiffs" does not assist the Court in identifying specific claims asserted against defendants [Doc. 240 p. 15]. Though plaintiffs do allege various facts involving defendants McKinley, Peters, and their employment or work with Solution Source [*See, e.g.* Doc. 6 ¶ 63, 65, 245–256], they do not adequately state a claim. That claims could potentially be made based on certain facts does not mean that alleging those facts also raises the associated claims. A party needs still to connect those facts to law and properly assert legal bases for relief, as discussed in Part II.B.1.

28

The only claims alleged in the complaint arise under conspiracy. In the section entitled "Actions Under the Color of State Law," plaintiffs state Solution Source is a "private person[] acting in collaboration and/or conspiracy with state actors [Doc. 6 ¶ 333]. In the § 1985 section, defendants are each named as "private persons and their agencies" [Doc. 6 p. 358]. These are the only places where defendants are specifically listed in a legal claim. Other instances where plaintiffs state "defendants" as a whole allegedly violated plaintiffs' rights are insufficient to put the defendants on notice of the claims against them. *Twombly*, 550 U.S. at 555. As the § 1985 claims have already been dismissed in this opinion, there are no other federal claims against defendants, and the Court declines to exercise supplemental jurisdiction over state law claims, there are no remaining claims against these defendants and they must be **DISMISSED**.

### 10. Section 1983 Claims

Section 1983's purpose is to guard against the "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Monroe v. Pape*, 365 U.S. 167, 184 (1961) (quoting *United States v. Classic,* 313 U.S. 325, 326 (1941)). It provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

29

42 U.S.C. § 1983. Plaintiffs must plead and prove two (2) elements to state a cause of action: (1) that a person has deprived him of a federal right, and (2) that the person has done so under color of state law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970). Plaintiffs here have alleged a variety of § 1983 claims. The Court initially addresses the claims under the Second Amendment and Free Exercise Clause and then proceeds defendant by defendant, ultimately dismissing all § 1983 claims.

### a. Second Amendment

Plaintiffs make several allegations that various defendants violated their Second Amendment rights: (1) defendant Burleson made "negative remarks" about Mr. Pethel exercising his Second Amendment right to carry firearms [Doc. 6 ¶ 192]; (2) Anderson County Sheriff's Department, Sheriff Paul White, and the foster parents released information or made comments that plaintiff Tobias Pethtel was always armed [*Id.* ¶ 471–72]; (3) one of the Pethtel children was asked about weapons in the home [*Id.* ¶ 473]; (4) Koehler reported there were targets in the basement [*Id.* ¶ 474]; (5) DCS restricted the Pethtels' activities while in the DCS office and told the Pethtels they would be subject to a search [*Id.* ¶¶ 475-79]; and (6) Mr. Pethtel received a letter from the Tennessee Department of Safety suspending his handgun carry permit because he had been falsely charged with a felony [*Id.* ¶ 480].

Additionally, plaintiffs in their response allege Mr. Pethtel was "deprived of his right to carry a handgun due to malicious prosecution" and that they were maliciously prosecuted by state defendants who "[knew] the criminal felony charge would prevent him

from exercising his right to carry a firearm." [Doc. 277 p. 47]. The complaint only mentions "false charges," but offers no particularity as to this theory of malicious prosecution with the purpose of firearm deprivation [Doc. 6 ¶ 480]. And as the Court has noted, complaints may not be amended "by the briefs in opposition to a motion to dismiss." *Car Carriers, Inc.*, 745 F.2d at 1107; *see supra* note. 11.

Under the Second Amendment, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment guarantees "an individual right to keep and bear arms" and for "law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 595, 635 (2008).[17] However, there are some limitations. In *Heller*, the Court cautioned that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626–27.

Plaintiff fails to state a claim for violation of the Second Amendment. The first four (4) allegations are general comments, and nothing more, about the Pethtels' firearm

---

[17] Plaintiff makes this claim based on the holding in *Heller* that individuals have the right to bear arms [Doc. 277 p. 47]. However, it was not applicable to the states during the relevant time period, as it was not applicable until the Court decided *McDonald v. City of Chicago*, 561, U.S. 742 (2010) in June of 2010. The case though is useful here as it more clearly articulates the "presumptively lawful regulatory measures" and "longstanding prohibitions." *Heller*, 443 U.S. at 627.

31

ownership and do not allege infringement of plaintiffs' right to bear arms. Mere references to or questions about gun ownership do not infringe on plaintiffs' rights. The fifth allegation that plaintiffs had certain restrictions while in the DCS office falls within the limitations permitted for "sensitive places such as . . . government buildings." *Id*. The sixth allegation that plaintiff's handgun carry permit was suspended due to his felony charge also falls within the *Heller* limitations. *Id*. (stating the holding does not cast doubt on the prohibitions against possession of firearms by felons). Additionally, the Tennessee Department of Safety, not any defendant in this case, suspended his permit, and the charges against him apparently were not false, as he was actually convicted of child abuse by a jury [Doc. 220-1].[18] Accordingly, plaintiffs have failed to state a Second Amendment claim, and the claim must be **DISMISSED** as to all defendants.

### b.     First Amendment Right to Free Exercise of Religion

Plaintiffs fail to state a claim as to free exercise of religion under the First Amendment. Plaintiffs allege violations against Koehler, Forrester, Stephanie Huckabey, Children's Center, Hazel Bumgardner, Goldstine, Hamilton, and "foster parents" [Doc. 6 ¶¶ 428–56]. Some of the allegations include: Koehler refusing to place the plaintiff children in their pastor's home [*Id*. ¶ 429]; Forrester stating there were "red flags in that church or with anyone of that religion" and that "the father is extremely controlling of the children" after he exhibited concern about the family's religious convictions [*Id*. ¶ 430,

---

[18]     *See Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994) (holding that a plaintiff cannot bring a civil rights action if a ruling on a claim would imply the invalidity of a conviction, unless that conviction has already been determined wrongful).

32

438]; the Children's Center showing the children anatomically correct drawings when the children had not yet been exposed to such pictures [*Id.* ¶ 432]; Goldstine stating "You think you are head of your house? Then you have a problem," "I am so surprised ya'll [sic] sat here and sang hymns about faith," and telling an attorney that plaintiffs' family was in a "sex cult" [*Id.* ¶ 444–45, 452]; various defendants "belittled" plaintiffs' support groups [*Id.* ¶ 446]; and a variety of statements that the children were allowed, by unspecified persons, to take certain actions [*Id.* ¶¶ 434–36].[19]

In the second to last paragraph of this section in the complaint, plaintiffs state, "Defendants have censored Plaintiffs from expressing their religious beliefs, in violation of Plaintiff's right to the free exercise of her religious beliefs" [*Id.* ¶ 455]. In the response to Foothills, Goldstine, and Hamilton's motion, plaintiffs say "State Defendants[20] violated the Pethtels' constitutional right to the free exercise of their religion by preventing the Pethtels from raising their children within their family religion" [Doc. 247 p. 22].

Plaintiffs use the word "censored" but fail to identify or allege any facts wherein they were prevented from exercising their religion. Moreover, these instances are not a result of a policy, law, regulation, or action against plaintiffs. Rather, the complained-of actions were mere comments made to them or another about them. Nothing alleged

---

[19] There is an additional allegation that "The Children were baptized without permission of their parents with no regard as to what Religion the parents were, DCS gave permission for the foster parents to baptize the children, knowing that the Plaintiffs would oppose" [Doc. 6 ¶ 439]. DCS has been dismissed from the case as discussed in Part II.B.7.

[20] This is another instance of recycled briefing wherein plaintiffs copied text from filings of other defendants, herein calling Goldstine and Hamilton "state defendants," which is a term both the parties and the Court have used for a different set of defendants.

33

involves direct action toward plaintiffs: "What is absent from this case is the critical element of compulsion to affirm or deny a religious belief or to engage or refrain from engaging in a practice forbidden or required in the exercise of a plaintiff's religion." *Mozert v. Hawkins Cty. Bd. of Educ.*, 827 F.2d 1058, 1069 (6th Cir. 1987) (holding that compelling students to read and discuss material in a textbook and hear other students' interpretations did not violate the First Amendment).

As to the allegation that Koehler refused to place the children in their pastor's home, this similarly does not allege such compulsion as the children may practice their religion elsewhere.[21] Placing the children in other homes and exposing them to different ideas, without requiring they disavow their beliefs, is akin to *Mozert* wherein the introduction of new viewpoints to plaintiff children was held not to violate the First Amendment. *Id.* Additionally, "the Supreme Court has never considered whether the Free Exercise clause prevents states from placing children with foster families whom state officials know, or have reason to know, will subject the children to practices at odds with their religious upbringing." *BK v. Toumpas*, 909 F. Supp. 2d 60, 64 (D.N.H. 2012). The Sixth Circuit similarly has not addressed the issue. *Abdulsalaam v. Franklin Cty. Bd. of Comm'rs*, 637

---

[21] Plaintiffs cite *Wisconsin v. Yoder*, 406 U.S. 205 (1972), wherein Old Order Amish parents had been charged, tried, and convicted for declining to send their children to public or private school past the eighth grade. In that case, the Supreme Court held that it was the parents' free exercise rights that had been violated. *Id.* at 230–31. Plaintiffs aver that because the Supreme Court held the state's interest in education was not sufficient to override the plaintiffs' free exercise rights that the state's interest here similarly should not outweigh plaintiffs' rights. However, *Yoder* is distinguished because the plaintiffs therein had been criminally prosecuted and for exercise of their religion. Here, plaintiffs are not being compelled by any law to take or refrain from taking religious action.

34

F. Supp. 2d 561, 583–84 (S.D. Ohio 2009), *aff'd*, 399 F. App'x 62 (6th Cir. 2010) (stating plaintiffs could not "cite a single precedent establishing that . . . Defendants acts—placement in a Christian foster home, refusal to place them in a Muslim foster home, refusal to provide them with a list of Muslim leader's phone numbers, or falsely reporting in FCCS' administrative file that they did not want to practice Islam—interfered with their right to free exercise").

"Government compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion, is the evil prohibited by the Free Exercise Clause." *Mozert*, 827 F.2d at 1066. "The lesson is clear: governmental actions that merely offend or cast doubt on religious beliefs do not on that account violate free exercise. An actual burden on the profession or exercise of religion is required." *Id*. at 1068. There must be action against plaintiffs more than mere offensive or unwanted comments.[22]

Plaintiffs have not alleged that they were required to disaffirm their beliefs, take any affirmative action, or refrain from practicing their religion. Plaintiffs state they were "censored" but do not allege any instances in which they were prevented from discussing their religion. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. And here, plaintiffs'

---

[22] As to plaintiffs' added ground in the response that defendants prevented the plaintiffs from raising their family within their religion, as the Court has repeatedly noted, plaintiffs may not amend the complaint through their response to a motion to dismiss. Additionally, plaintiffs listed different defendants than at issue here.

Free Exercise claims are not sufficiently supported. Consequently, plaintiffs have failed to state a free exercise claim, and such claims must be **DISMISSED** as to all defendants.

### c.    **Anderson County Health Department**

Plaintiffs mention the Anderson County Health Department ("Health Department") under the section entitled "Action under the Color of State Law" and bring suit "under the legal theory of Respondeat Superior" [Doc. 6, Parties, ¶ 49] but none of the Health Department's employees have been named as defendants [*Id.* ¶¶ 10–54]. Even so, Section 1983 does not support claims based on *respondeat superior*. *Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981).

The Health Department may only be held directly liable under Section 1983 for unconstitutional policies, practices, or customs that were the "moving force" behind the deprivation of plaintiffs' rights. *Id.* Plaintiffs must show "that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).

In the complaint, the Health Department is only listed as a party and referenced in allegations that tests were performed [Doc. 6 ¶ 33] and a search was conducted [*Id.* ¶ 36] at the Health Department's facility. It is also referenced as a private person acting in collaboration or conspiracy with state actors [*Id.* at 333]. While they allege a conspiracy with state actors, plaintiffs fail to allege specific factual allegations regarding action in

furtherance of the conspiracy on behalf of the Health Department itself. The Court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan*, 478 U.S. at 286, and plaintiffs fail to support their claim with actual facts supporting conspiracy. *Iqbal*, 556 U.S. at 678 (providing that "an unadorned, the-defendant-unlawfully-harmed-me accusation" will not do).

Given the explicit designation of the claim as being brought under *respondeat superior*, instead of against the Health Department directly, and in light of plaintiffs' failure to reference any independent actions or facts supporting their conspiracy claim, the complaint fails to put the Health Department on notice of any claim other than one brought under a theory of *respondeat superior* which is not a viable claim. *Twombly*, 550 U.S. at 555. Accordingly, all § 1983 claims against the Health Department must be **DISMISSED**.

### d.    Clinch Valley Children's Center

Plaintiffs allege several § 1983 claims against the Clinch Valley Children's Center ("Children's Center"). Under which theory they intend to bring § 1983 claims against the Children's Center is unspecified and is unclear in both the complaint and the claim chart. Nonetheless, all § 1983 claims must fail as to the Children's Center, as plaintiffs allege liability based on *respondeat superior*. In the caption of the complaint, and in the "Parties" section, plaintiffs state "CLINCH VALLEY CHILDREN'S CENTER as Respondeat Superior," and "[t]his organization is being sued under the legal theory of Respondeat Superior" [Doc. 6, Parties, ¶ 15]. This is not a valid theory of liability under § 1983. *See Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012) ("Indeed, 'every circuit to consider the

37

issue' has extended 'to private corporations as well' the rule that a defendant cannot be held liable under section 1983 on a respondeat superior or vicarious liability basis." (citations omitted)).

As with the Health Department, the Children's Center may only be held directly liable under Section 1983 for unconstitutional policies, practices, or customs.  In their response, plaintiffs attempt to identify where in the complaint they state such a claim and point out that Margaret Durgin, as Executive Director, participated in and explicitly encouraged unconstitutional conduct and that she conspired with DCS to separate the family and participate in the November 2009 search of M.P.P. [Doc. 6 ¶¶ 88, 352].  These actions, plaintiffs aver, indicate an unconstitutional policy to train its employees or a policy wherein an authorized policymaker approved subordinates' unconstitutional decisions [Doc. 316 p. 17–18].  While entities may be held liable for having unconstitutional policies, plaintiffs have alleged nothing to this effect.

To state a claim, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal citations omitted).  Here, plaintiffs have done the opposite.  Plaintiffs alleged specific facts as to Durgin's actions, but those allegations do not support a viable claim.  In the "continuing wrongs" section, plaintiffs assert "these defendants continue to violate the statutory and constitutional rights of the Plaintiffs" and that these acts "are part of a pattern of discrimination against the Pethtel

38

family" [*Id.* ¶¶ 313, 315]. Yet, plaintiffs do not assert to which defendants they refer when they state "these defendants."

Given the explicit designation of the claim being brought under a theory of *respondeat superior* instead of against the Children's Center directly, the failure to reference any policies, and the references to defendants generally, the complaint is insufficient to put the Children's Center on notice of a claim other than one brought under a theory of *respondeat superior* which, as discussed, is not a viable claim. *Twombly*, 550 U.S. at 555. Accordingly, all § 1983 claims against the Children's Center, must be **DISMISSED**.

> ### e. Clinch Valley Defendants (Stacey Pratt and Margaret Durgin) and Gail Clift

Plaintiffs, in their claim chart [Doc. 140-1], state that they allege a variety of § 1983 claims against Stacey Pratt and Margaret Durgin stemming from their work at the Children's Center. Paragraphs 349 through 354 in their complaint which lay out plaintiffs' § 1983 claims do not support the claims plaintiffs purport to have brought against these defendants in the claim chart. In their response to Gail Clift's motion to dismiss [Doc. 315], plaintiffs assert they stated a claim under § 1983. In the complaint, prior to listing the specific constitutional violations, plaintiffs identify many defendants who are "state actors within the meaning of 42 U.S.C. § 1983 *et seq.*" [Doc. 6 ¶ 350]. Pratt, Durgin, and Clift are not listed. In fact, Pratt is not mentioned at all in this section. While facts are alleged previously in the complaint about her conduct, plaintiffs fail to ever actually connect a

specific claim to those facts. Accordingly, Pratt is not on notice of any such claims. *Twombly*, 550 U.S. at 555.

Clift and Durgin are mentioned in the section alleging a § 1983 violation through the Fourth and Fourteenth Amendments wherein "Plaintiff M.M.P. was seized by state actors of the State of Tennessee Department of Children's Services by and through Cynthia Koehler and Katie Butler and Clinch Valley Children's Center of Anderson County, Tennessee, Inc. by and through Gail Clift and Margaret Durgin in November 2009 and caused to be searched . . . . " [Doc. 6 ¶ 352(c)(4)]. This is the only mention of an examination involving Durgin, and it is not stated how she "caused" M.M.P. to be searched. Earlier in the complaint, plaintiffs admit an examination of E.L.P. was conducted by Clift [Doc. 6 ¶ 86], and there is no indication of Durgin participating in, conducting, or ordering any search. To the extent plaintiffs' claim chart or response indicates additional § 1983 claims against Durgin and Clift respectively, none are supported by the complaint. The only remaining § 1983 claim is thus the Fourth Amendment claim against Durgin and Clift.

Two (2) elements are necessary to state a cause of action under 42 U.S.C. § 1983. The plaintiff must plead and prove (1) that some person has deprived him of a federal right, and (2) that the person has done so under color of state law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970). Thus, claims are typically alleged against state actors, consistent with the second element. However, private persons "jointly engaged with state officials . . . are acting under color of law for purposes of the statute. . . . [it] is enough that he is a willful participant in joint activity with the state or its agents." *Id*. at 152. Plaintiffs

40

assert Durgin and Clift are private actors [Doc. 6 ¶ 358] who acted jointly with state actors DCS and its agents [*Id.* ¶¶ 88, 352(c)(4)].[23]

Even though private persons, qualified immunity applies to Durgin and Clift, and they are entitled to dismissal of this claim on that basis. The doctrine of qualified immunity protects government officials in discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 727 (6th Cir. 2011). But even those who are not governmental officials or employees may be entitled to qualified immunity.

In *Filarsky v. Delia*, the Supreme Court held that a private actor working on behalf of the government is entitled to seek protection under qualified immunity. 566 U.S. 377, 394 (2012). If not granted immunity, private individuals could face legal action for conduct that would be protected were their employer alternatively the government. Instead of engaging in line drawing to determine how pervasive a private actor's work for the government is, the Court held "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on

---

[23] To the extent plaintiffs assert they are state actors in their response [Doc. 316 p. 15], plaintiffs have failed to state a claim as they offer no facts as to the other essential element of the claim, that is, that she had acted under color of state law. *See Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 518–19 (6th Cir. 2008) (holding a complaint must contain allegations supporting all material elements of a claim). Their only viable claim on the basis of this complaint as written would be under *Adickes,* namely that Durgin and Clift are private actors willfully participating in joint activity with state actors. Nonetheless, even if status as a state actor had been properly alleged, the qualified immunity analysis would proceed on the same basis as a governmental official in a discretionary function under *Pittman* or a private actor working on behalf of the government under *Filarsky.*

41

some other basis." *Id*. at 389. The Court stated "it is often when there is a particular need for specialized knowledge or expertise that the government must look outside its permanent work force to secure the services of private individuals." *Id*. at 390. In *Filarsky*, a private attorney with almost thirty (30) years of experience in conducting internal affairs investigations was retained by the city to do the same, and the Court held he was entitled to qualified immunity. *Id*. Similarly, here, the government looked to utilize the knowledge and skills of external child specialists in their investigation. Durgin and Clift worked for a non-governmental entity, Clinch Valley Children's Center and Pediadvocates, respectively, and were assisting government officials with the investigation into child abuse by the plaintiff parents. They are therefore eligible for protection under qualified immunity.

Once a defendant raises qualified immunity, "the burden is on the plaintiff to demonstrate that the official[ is] not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). Plaintiffs must show (1) "facts which, when taken in the light most favorable to [the plaintiff], show that the defendant-official's conduct violated a constitutionally protected right;" and (2) "that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right." *Pittman*, 640 F.3d at 727. The order in which to address the two (2) prongs is left to the Court's discretion. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

42

Thus, the Court will address the second prong and look to the state of the law at the time of the incident in question. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). To be considered clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The legal propositions are considered in light of the specific context of the case, not at higher levels of generality. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). For example, "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). While the standards need not be so specific as to be directly on point, courts should look to precedents that are "particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017). The law is clearly established when the plaintiff can point either to "cases of controlling authority in his jurisdiction at the time of the incident" or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Kent v. Oakland Cty.*, 810 F.3d 384, 395 (6th Cir. 2016) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). "Existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Pauly*, 137 S. Ct. at 551 (quotations omitted).

In the complaint, plaintiffs appear to preemptively address a qualified immunity defense in paragraphs 322 through 329. They claim "Defendants" generally should have known their actions violated plaintiffs' "statutory and constitutional rights and were contrary to clearly established law" without any reference to which particular law, and entirely devoid of reference to what decisions make those laws so clearly established [Doc. 6 ¶ 323]. In a section titled "actions under the color of state law," plaintiffs allege the defendants' acts violated their substantive due process right to "familial and parental relationships" and cite several Supreme Court cases about the right generally [Doc. 6 ¶ 322]. They do not mention any other categories of constitutional violations with their associated case law in the complaint.

In their responses to the motions to dismiss, to address Durgin and Clift's qualified immunity, plaintiffs cite one case from the Northern District of Ohio, *Walsh v. Erie Cty. Dep't of Job & Family Servs.*, 240 F. Supp. 2d 731, 758 (N.D. Ohio 2003), which held that the Fourth Amendment applies to social workers[24] [Doc. 316 p. 34–35; Doc. 315 p. 9]. The Court presumes plaintiffs intend this to indicate that the Fourth Amendment applies to persons working with children.

The rest of their argument claims these actions were "objectively unreasonable" and that it "strains the imagination" to believe they were reasonable, without citing any supportive precedent [Doc. 316 p. 35; Doc. 315 p. 10]. Indeed, plaintiffs fail to cite a single

---

[24] The Court notes that this case is factually distinguishable because there, social workers entered the private home of plaintiffs and therein conducted a search.

44

case of controlling authority in this jurisdiction. They do not cite anything with any degree of particularity as to these facts of a medical examination. Considering Clift was acting on referral from DCS, who had custody of the children at the time, and DCS has "the right to physical custody of the child" and "the right to determine the nature of the care and treatment of the child, including ordinary medical care," plaintiffs fail to show how Clift should have known her actions violated plaintiffs statutory and constitutional rights in such circumstances. T.C.A. § 37-1-140(a).

Plaintiffs in fact remain at the same level of abstraction as *Ashcroft v. al-Kidd* which explicitly stated that the general proposition that the Fourth Amendment applies is of "little help in determining whether the violative nature of particular conduct is clearly established." 563 U.S. at 742. Plaintiffs have failed to meet their burden to demonstrate that Durgin is not entitled to qualified immunity, and this claim is dismissed on that basis. *Silberstein*, 440 F.3d, at 311. Accordingly, all § 1983 claims against Durgin, Pratt, and Clift are **DISMISSED**. To the extent that Clift asks for attorney's fees and costs pursuant to 42 U.S.C. § 1988, defendant's request is cursory and does not provide a basis for relief. The request is **DENIED without prejudice** with leave to refile with necessary and appropriate fee requests and briefing.

### f.    Pediadvocates

Plaintiffs bring this action against Pediadvocates under *respondeat superior* as the "employer of Gail Clift" [Doc. 6, Parties, ¶ 51]. Gail Clift is the owner of Pediadvocates [Doc. 6 ¶ 87; Doc. 286 p. 5]. Since the action is brought under vicarious liability for the

45

actions of Clift, and there are no bases remaining for Clift's liability, Pediadvocates is not liable. In their response plaintiffs claim defendant Pediadvocates is liable on account of its unconstitutional policies [Doc. 314 p. 8]. However, such claims are not raised in the complaint. The only remark vaguely addressing such a claim is that "Pediadvocates has a responsibility to train their employees" [Doc. 6 ¶ 87].

"[A] systematic failure to train employees amounts to a custom or policy for which the employer may be subject to § 1983 liability only if such failure amounts to deliberate indifference to the rights of persons with whom the employees come into contact." *Savoie*, 673 F.3d at 494–95. Additionally, to establish such indifference, "the plaintiff must show prior instances of unconstitutional conduct demonstrating that the [employer] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Id*.

Plaintiffs' vague statement about responsibility to train does not rise to the level of specificity to put Pediadvocates on notice for a claim arising out of company policy, especially given that the complaint identifies the theory as *respondeat superior* instead of direct liability. Accordingly, all § 1983 claims against Pediadvocates are **DISMISSED.** To the extent that Pediadvocates asks for attorney's fees and costs pursuant to 42 U.S.C. § 1988, defendant's request is cursory and does not provide a basis for relief. Their request is **DENIED without prejudice** with leave to refile with necessary and appropriate fee requests and briefing.

       **g.**    **Leigh Anne Goldstine, Stella Hamilton, and Foothills, LLC**

46

Plaintiffs bring a § 1983 claim against Stella Hamilton for violations of the federal right to free exercise of religion and against Leigh Anne Goldstine for violations of the federal First Amendment right to free speech and exercise of religion. Though other theories of § 1983 are discussed in the briefing, none mention either of these defendants, and referring to defendants generally, is insufficient to put Goldstine and Hamilton on notice for those claims, as discussed in Part II.B.1. The free exercise claims are addressed and dismissed above in Part II.B.10.b.

Plaintiffs allege a § 1983 free speech claim against Goldstine in that she "censored Plaintiff's [sic] at visits from discussion of their religious views of the father being the 'head of the house'" [Doc. 6 ¶ 424]. In the factual allegations portion of the complaint, plaintiffs elaborate on an instance where Goldstine told Tobias Pethtel, "You are the head of the household – you have a real problem" [*Id*. at ¶ 278]. Similar to the free exercise claim, plaintiffs failed to state a claim for a violation of their rights to free speech because they do not allege any ways in which their speech was limited or restricted. While the Court must take factual allegations as true, a party's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." *Twombly*, 550 U.S. at 555. All plaintiffs allege is one statement by Goldstine that neither requires nor prohibits any speech; that plaintiffs may have chosen to respond to said statement in a particular way does not violate the First Amendment. Accordingly, plaintiffs fail to state a claim, and all § 1983 claims against Goldstine and Hamilton must be **DISMISSED**.

47

Foothills "is being sued under the legal theory of respondeat superior" for actions of employees Leigh Anne Goldstine and Stella Hamilton, each also being sued in their individual capacity [Doc. 6, Parties, ¶¶ 16, 37, 38; Doc 6 ¶¶ 64, 293]. As *respondeat superior* is not a cognizable theory under § 1983 and both employees are not liable, the *respondeat superior* claim must be dismissed. To the extent plaintiffs' response alleges responsibility for unconstitutional policies for failure to train employees [Doc. 247 p. 9], the claim is not properly raised.

First, plaintiffs fail to allege any actual additional § 1983 claims against Foothills. The substantive allegations begin on page fifty-nine (59) of the complaint. Foothills is only mentioned as a private person or actor working in collaboration or conspiracy with state actors [Doc. 6 ¶ 333], in the section regarding § 1985 conspiracy [*Id*. ¶ 358], and there is a parenthetical mentioning case notes in the Second Amendment section [*Id*. ¶ 477]. As previously addressed above, the § 1985 and § 1983 Second Amendment claims are dismissed. Statements that a person is a private actor acting in collaboration with state actors, without further detail, does not allege a claim.

Assuming, *arguendo*, that Foothills had been mentioned in a section outlining a constitutional violation, there is no liability here for an unconstitutional policy for failure to train employees under *Savoie*. 673 F.3d at 494–95.

Plaintiffs only state in the factual portions of the complaint that Foothills is "responsible for the proper training and monitoring of their employees," "should have been aware of the wretched conditions of the therapeutic sessions being provided to the Pethtel

48

family," and "should also be trained to respect the religious beliefs of their clients" [Doc 6 ¶¶ 292, 302]. These statements fail to rise to the level of specificity required to state a claim for failure to train the employees, as "bare allegations of a custom or policy, unsupported by any evidence, are insufficient to establish entitlement to relief." *Broyles v. Corr. Med. Servs., Inc.*, No. 08-1638, 2009 WL 3154241, at *2 (6th Cir. Jan. 23, 2009) (citing *League of United Latin Am. Citizens v. Bredesen*, 400 F.3d 523, 527 (6th Cir. 2007). Finally, Foothills is not sued directly, but only under *respondeat superior* for vicarious liability of its employees. Accordingly, all claims against Foothills must be **DISMISSED**.

### h. Foster parents: the Ruffs, the Huckabeys, and Hazel Bumgardner

Plaintiffs assert a variety of § 1983 claims in their claim chart against foster parents Jay and Stephanie Huckabey, Martha and Stephen Ruff, and Hazel Bumgardner (together, "foster parents") [Doc. 140-1]. However, all such claims against the foster parents should be dismissed because they are not state actors.

A private party may be deemed to be a "state actor" if the party's actions are "fairly attributable to the state." *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 937 (1982). The Sixth Circuit has recognized three (3) tests to determine whether the action by a private individual may be fairly attributable to the state: (i) the public function test; (ii) the state compulsion test; and (iii) the symbiotic relationship/nexus test. *Chapman v. Higbee Co*., 319 F.3d 825, 833 (6th Cir. 2003) (en banc).

First, under the public function test, a private party is deemed to be a state actor if the powers exercised by that party have traditionally been exclusively reserved to the state.

49

*Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir.1992). This standard is not just those functions exercised by governments but includes only the "very few [that] have been exclusively reserved to the State." *Flagg Bros. v. Brooks*, 436 U.S. 149, 158 (1978). This is a narrow set, and only functions like "holding elections, exercising eminent domain, and operating a company-owned town, fall under this category of state action." *Chapman*, 319 F.3d at 833–34 (internal citations omitted). "While removing a child from her home and placing her with other caregivers are arguably exclusive governmental functions . . . the day-to-day provision of foster care is not." *Brown v. Hatch*, 984 F. Supp. 2d 700, 708 (E.D. Mich. 2013) (collecting cases). Here, plaintiffs have not alleged that the foster parents are exercising any such exclusively reserved powers.

Second, the state compulsion test involves determining whether the state exercised coercive power or control over them and "requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Wolotsky*, 960 F.2d at 1335. "More than mere approval or acquiescence in the initiatives of the private party is necessary to hold the state responsible for those initiatives." *Id.* Some factors the Sixth Circuit considered were funding, personnel policies or decision, and selection of the executive director. *Id.* Plaintiffs have alleged that the foster parents conspired or agreed to a common objective of influencing familial and parental relationships with state actors [Doc. 6 ¶¶ 358–60], but plaintiffs have not alleged anything that rises to the level of coercion.

50

Third and finally, under the symbiotic relationship/nexus test, a private party may be a state actor if there is a "sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Wolotsky,* 960 F.2d at 1335. There is no particular formula to make this decision, but its analyzation accounts for the attending facts and circumstances. That someone is subject to state regulation "does not by itself convert its action into that of the State," nor do actions "of a private party . . . become state action merely because the government provides funding." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999); *Lintz v. Skipski*, 807 F. Supp. 1299, 1306 (W.D. Mich. 1992), *aff'd on other grounds*, 25 F.3d 304 (6th Cir. 1994). Additionally, it is insufficient "that the two entities be entwined in some way; they must be entwined with regard to the actions in the case at hand." *Thompson v. Davidson Transit Org.*, 563 F. Supp. 2d 820, 826 (M.D. Tenn. 2008). Rather, it must be demonstrated that the state is "intimately involved in the challenged private conduct in order for that conduct to be attributed to the state for purposes of section 1983." *Wolotsky*, 960 F.2d at 1335.

Plaintiffs do not allege any specific facts that allow the Court to infer such a close relationship between the foster parents and the state. Plaintiffs allege Bumgardner received "board payments for the Pethtel children" [Doc. 6 ¶ 128], and that the foster parents were "government-assigned foster parent[s]" [Doc. 6 ¶¶ 120, 130, 150], but make no claims as to the entanglement of the actions at issue. Instead, factual allegations [Doc. 6 ¶¶ 120–158] are individual, discrete acts of the foster parents, for example: Bumgardner took

51

plaintiffs to get their ears pierced contrary to the parent's wishes, arranged a doctor's appointment, and told plaintiffs "they were not allowed to discuss their own religious views" [Doc. 6 ¶¶ 120, 126, 423]; the Huckabeys implemented rules, made statements and allegations, and made facial expressions and gestures during a meeting [*Id.* ¶¶ 132, 135, 136, 143]; the Ruffs called plaintiff a liar, stroked her hair, and talked to the children about allegations from DCS [*Id.* ¶¶ 152, 153, 157]. None of these allegations indicate a symbiotic relationship between the foster parents and the state.

Consequently, the foster parents are not state actors.[25] This is consistent with courts both within and outside of this circuit, each holding that foster parents are not state actors for purposes of § 1983.[26] Additionally, and more specifically, in *Hancock v. Miller*, a

---

[25] Plaintiffs state that the Supreme Court "indicated in dicta that it would consider foster parents to be state actors" [Doc. 277 p. 24]. In *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989), plaintiff brought a § 1983 suit after his father beat him because state social workers had reason to believe he was in danger but did not act. The Court held that the events were private, and the state's failure to protect the plaintiff was not a constitutional violation. *Id.* at 197. In a footnote, the Court said:

> Had the State by the affirmative exercise of its power removed [plaintiff] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Indeed, several Courts of Appeals have held . . . that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents.

*Id.* at n.9. While this case influenced other decisions about foster parents as state actors, *DeShaney* only hypothesized about a duty on behalf of the state and did not directly refer to the duty or liability of foster parents.

[26] *See Brown*, 984 F. Supp. 2d at 709 (holding that foster parents are not state actors under any of the three tests); *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 852 (7th Cir. 1990); *Milburn v. Anne Arundel Cty. Dept. of Social Services*, 871 F.2d 474, 479 (4th Cir. 1989).

52

district court held that Tennessee foster parents were not state actors. No. 2:19-CV-00060, 2020 WL 1493609, at *9 (M.D. Tenn. Mar. 27, 2020).[27]

For the same reasons that foster parents do not have a symbiotic relationship with the state, they are not willfully engaged in joint activity with the state to make private parties liable under § 1983 in a conspiracy. *Adickes*, 398 U.S. at 152 (1970). The conspiracy alleged in the § 1985 section to interfere with familial relationships is unrelated to the allegations regarding free exercise as to all foster parents [Doc. 6 ¶¶ 433, 446, 439],

---

[27] In providing an overview of the case law, the court stated:

"[C]ourts have consistently held that the decisions of foster parents are not state action." *Anderson v. Nebraska*, 4:17-CV-3073, 2018 WL 3009115, at *8 (D. Neb. June 15, 2018) (collecting cases). For example, in *Brown v. Hatch*, the Court concluded that a foster parent was not a state actor despite being an agent of a foster care agency that was a state actor. 984 F. Supp. 2d at 708-09. Citing extensive authority, the court held that providing day-to-day foster care services was not an exclusive government function, the state was not involved in day-to-day decisions of the foster parent, and a close nexus was not established merely by a foster parent being licensed by the state or "receiving remuneration in exchange for providing foster care services." *Id.* Likewise, in *Howell v. Father Maloney Boys' Haven, Inc.*, Civil Action No. 3:18-CV-00192-GNS, 2020 WL 42892, at *6-7 (W.D. Ky. Jan. 3, 2020), another court in this circuit recently declined to find that a foster home was a state actor. In doing so, the court stressed that the foster home was "engag[ed] in the private function of providing day-to-day care" and "d[id] not take part in the unquestionably public functions of the removal of children from their homes, the placement of those children in an appropriate environment, or the monitoring of foster homes." *Id.*; see also, e.g., *Ismail v. Cty. of Orange*, 693 F. App'x 507, 512 (9th Cir. 2017) ("Merely serving as a foster parent does not transform a private party into a state actor."); *Leshko v. Servis*, 423 F.3d 337, 345-46 (3d Cir. 2005) (rejecting application of a common law parens patrie duty and holding that foster parents are not state actors under Section 1983); *United States v. Peneaux*, 432 F.3d 882, 896 (8th Cir. 2005) ("[F]oster parents are generally not considered agents of the state."); *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001) (holding foster parents are not state actors under Section 1983); *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 392 (4th Cir. 1990) ("[H]arm suffered by a child at the hands of his foster parents is not harm inflicted by state agents.").

*Id.*

53

against the Ruffs regarding the Second Amendment [*Id.* ¶¶ 446, 472], and Bumgardner

regarding free speech [*Id.* ¶ 420]. There are no further allegations of conspiracy as to these

constitutional violations. Consequently, all § 1983 claims against the foster parents must

be **DISMISSED.**

### i. Social Workers: Samantha Cardwell, Katie Butler, and Cynthia Koehler

Cardwell, Butler, and Koehler are Child Protective Services Investigators for DCS

[Doc. 6, Parties, ¶¶ 22–24]. They each have § 1983 claims alleged against them for

violations of the Fourth Amendment arising out of a search and seizure of various plaintiffs

in November 2009 [Doc. 6 ¶ 352 (a)(4), (c)(4), (d)(4)–(5)]. However, these defendants are

entitled to qualified immunity for their actions.

Looking at the second prong of the qualified immunity analysis, the state of Fourth

Amendment law at the time was not clearly established such that the social workers would

have understood their behavior was unconstitutional. *Pittman*, 640 F.3d at 727. Though

plaintiffs attempt to cite cases to prove it was clearly established,[28] the Sixth Circuit has

explicitly held that, at least through 2011, the relationship between social workers and the

warrant requirement was not clearly established. *Hall v. Sweet*, 666 F. App'x 469, 479

---

[28] Plaintiffs spent extensive time briefing various cases which they purport collectively establish that the violation was clearly established. However, plaintiffs' main citations are neither binding nor persuasive. Plaintiffs cite the Ninth Circuit's decision in *Rogers v. Cnty. of San Joaquin*, 487 F.3d 1288 (9th Cir. 2007) and the Northern District of Ohio's decision in *Walsh v. Erie County Dep't of Job & Family Servs.*, 240 F. Supp. 2d 731 (N.D. Ohio, 2003).

(6th Cir. 2016) (collecting cases).[29]   The uncertainty of the Fourth Amendment's applicability to social workers at the time, in addition to the Tennessee statutes mandating investigation of allegations of child abuse and neglect, Tenn. Code Ann. § 37-1-406(a), and granting authority to consent to ordinary medical care for children in its custody, Tenn. Code Ann. § 37-1-140(a), together establish that the social workers would not have understood their behavior was unconstitutional.   Thus, they are entitled to qualified immunity for these claims, and such Fourth Amendment claims are **DISMISSED**.

### j.      Other Defendants

This section addresses various defendants against whom plaintiffs allege facts at the beginning of the complaint but fail to connect such facts to a legal claim.

---

[29] At the time of the incidents at issue, the Supreme Court and Sixth Circuit had not yet addressed the issue. *See Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016) ("No Supreme Court precedent defines when a warrant is required to seize a child under exigent circumstances."); *Andrews v. Hickman Cnty.*, 700 F.3d 845, 860 (6th Cir. 2012) ("The Supreme Court has not expressly held that the Fourth Amendment prohibition on warrantless searches of homes does or does not apply to social workers carrying out investigations regarding the welfare of children.").   In December 2012, the Sixth Circuit held for the first time that social workers are governed by the warrant requirement (noting that up until that point, the court "ha[d] not . . . had occasion to definitively address this issue").   Additionally, "it was [previously] not evident under clearly established law whether [social workers] were even required to comply with the strictures of the Fourth Amendment." *Id.* at 863.

Plaintiffs' arguments that *Rogers* and *Walsh* clearly establish the right is defeated by the holding in *Andrews*.   For a right to be clearly established, there must be "binding precedent by the Supreme Court, its court of appeals[,] or itself." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042–43 (6th Cir. 1992).   The Sixth Circuit held that *Walsh* as a single district court opinion was insufficient to pronounce a right as clearly established in *Hall*.  666 F. App'x. at 481.   As to *Rogers*, for out-of-circuit cases to provide such clearly established law, "these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting." *Russo*, 953 F.2d at 1043.   *Rogers* was not foreshadowed by applicable direct authority in this Circuit as demonstrated by *Andrews*.

55

Julia Rotella and Pamela Becker are mentioned only sparsely in the complaint: they were Regional Administrator and Team Leader of the State of Tennessee DCS [Doc. 6, Parties, ¶¶ 26, 27]; DCS by and through Rotella, Becker, and others, called in a false report on the Crawford Family, in whose home plaintiffs wished their children to be placed [Doc. 6 ¶ 25]; DCS by and through Rotella, Becker, and others did not allow a plaintiff to visit with her siblings [*Id.* ¶ 102]; and they are state actors [*Id.* ¶ 350, 356] and private persons [*Id.* at ¶ 358].

Sean Morehead is mentioned in the following paragraphs: as Regional General Counsel and supervisor of Erin Schad for DCS [Doc. 6, Parties, ¶ 25]; he filed a lawsuit for termination of parental rights in Anderson County Chancery Court without notifying the parents [Doc. 6, ¶ 172]; DCS by and through Morehead accused M.M.P. of being a perpetrator [*Id.* ¶ 199]; and he is a state actor [*Id.* ¶ 350, 356] and private person [*Id.* ¶ 358].

Erin Schad is mentioned in the following paragraphs: as Assistant General Counsel for DCS [Doc. 6, Parties, ¶ 24]; she refused to look over or sign an agreed order for DCS to supervise visitation between plaintiff children and parents; and she is a state actor [*Id.* ¶ 350, 356] and private person [*Id.* ¶ 358].[30]

Terry Ryan is mentioned in the following paragraphs: as a Special Investigative Unit investigator for DCS [Doc. 6, Parties, ¶ 52]; he failed to talk to parents and get all information required in the investigation into sexual abuse allegations including

---

[30] Schad is additionally mentioned in the section on libel and slander [Doc. 6 ¶ 371, 372] and Violations of the Brian A. Settlement Agreement [*Id.* ¶ 514], which claims have been addressed elsewhere in this opinion.

56

interviewing the children, not talking to the parents about the children's history in Russia, interviewed a six (6) year old based on allegations from the foster family [Doc. 6 ¶ 37]; and is a state actor [*Id.* ¶ 350].

Helen Burleson is mentioned in the following paragraphs: as a Case Manager at DCS [Doc. 6, Parties, ¶ 20]; she called in a false report on the Crawford Family, in whose home plaintiffs wished their children to be placed [Doc. 6 ¶ 25]; she allowed Jay Huckabey to videotape child plaintiff during a pickup of the children by the Crawford family [*Id.* ¶ 26]; she gave erroneous information on a form knowing it would cause the form to be rejected [*Id.* ¶ 27]; she took plaintiff child or caused her to be taken to a doctor to perform a pelvic exam [*Id.* ¶ 33]; she conspired to keep plaintiff children away from their parents [*Id.* ¶ 88]; she called a judge a "hottie" [*Id.* ¶ 160]; filed the termination of parental rights suit without parental permission [*Id.* at ¶ 172]; and she told foster parents the children had been sexually abused [*Id.* ¶ 173]. DCS by and through Burleson: did not allow a plaintiff to visit with her siblings [*Id.* ¶ 102]; misused therapeutic visits to trap the Pethtel parents into admitting allegations [*Id.* ¶ 181]; allowed the foster parents to influence the children's therapists, educators, and other adults [*Id.* ¶ 185]; made negative remarks about Pethtel exercising his second amendment right [*Id.* ¶192]; allowed plaintiff children to be baptized without notice to the parents [*Id.* ¶ 196]; accused M.M.P. as a perpetrator [*Id.* ¶ 199]; and

57

met with representatives of Foothills Care [*Id.* ¶ 263]. Additionally, Burleson is a state actor [*Id.* ¶ 350, 356] and private person [*Id.* ¶ 358].[31]

Heather Poster is mentioned in the following paragraphs: as an employee of DCS [Doc. 6, Parties, ¶ 48]; she obstructed a doctor from performing medical duties [*Id.* ¶ 35]; allowed a "search and seizure" of the children's toys when they were taken to the Health Department and searched for "bugs" in September 2010 [*Id.* ¶ 36]; and she is a state actor [*Id.* ¶ 350].[32]

Shannon Forrester is mentioned in the following paragraphs: as a Team Supervisor at DCS [Doc. 6, Parties, 19]; she called in a false report on the Crawford Family, in whose home plaintiffs wished their children to be placed [Doc. 6 ¶ 25]; she allowed Jay Huckabey to videotape a plaintiff child during a pickup of the children by the Crawford family [*Id.* ¶ 26]; DCS by and through Forrester: refused to allow a plaintiff child to visit with siblings [*Id.* ¶ 102], allowed foster parents to influence children's therapists, educators, and other adults [*Id.* ¶ 185], made negative remarks about plaintiffs' religious preferences [*Id.* ¶ 193], accused and indicated M.M.P. as a perpetrator for sexual abuse [*Id.* ¶ 199], met with

---

[31] Burleson is additionally mentioned in the section about the state constitutional right to equal protection [*Id.* ¶ 483] and violations of DCS policy [*Id.* at ¶ 524(v)].

[32] Though plaintiffs allege in the factual general allegations portion of the complaint, the only Fourth Amendment § 1983 claims are based on other searches in November 2009 of persons and or the plaintiffs' home. Plaintiffs make no legal claims arising out of the September 2010 "search" and do not state from where they were seized. Especially given the association of the Fourth Amendment unlawful search and seizure claims [Doc. 6 ¶ 352(a)–(d)] with other dates and events, the statement in the factual allegations that Poster was somehow involved in this search and seizure of an unspecified location with no later legal claim or count associated with it is insufficient to put Poster on notice of a claim against her.

58

representatives of Foothills before and after every family visitation session [*Id.* ¶ 263]; and is a state actor [*Id.* ¶ 350, 356] and private person [*Id.* ¶ 358].[33]

As discussed in Part II.B.1, this fails to state any claims as to which named defendant was responsible for violations of plaintiffs' rights. *Frazier*, 41 F. App'x at 764. Failure to connect factual allegations to any legal claims or allegations does not put defendants on notice of the claims against them. *Twombly*, 550 U.S. at 545. Though facts may be alleged earlier in the complaint, the failure to state which constitutional violations apply to the defendants and a general statement under a § 1983 heading that the defendants are state actors is akin to a "the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Accordingly, all claims against Julia Rotella, Pamela Becker, Sean Morehead, Erin Schad, Terry Ryan, Helen Burleson, and Heather Poster must be **DISMISSED.**

### 11. Supplemental Jurisdiction

While a district court has supplemental jurisdiction over state-law claims forming "part of the same case or controversy" as claims over which the court exercises original jurisdiction, 28 U.S.C. § 1367(a), a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) (citing 28 U.S.C. § 1367(c)(3)). Because the Court in this opinion will dismiss all of plaintiffs' claims arising under federal law, it will also **DISMISS without prejudice** plaintiffs' remaining state law claims.

---

[33] Forrester is also mentioned in the section regarding free exercise of religion [*Id.* ¶ 430, 438] and state equal protection [*Id.* ¶ 493], addressed in Parts II.B.10.b and II.B.11.

59

### III.    Second Amended Complaint

Plaintiffs originally filed this suit on November 8, 2010 [Doc. 1].  On March 3, 2011, plaintiffs filed an amended complaint against all defendants [Doc. 6].  On the basis of that complaint, many defendants filed motions to dismiss [Docs. 63, 65, 67, 69, 74].  When the case was stayed pending resolution of the proceedings in state juvenile court and state criminal court in September 2011, these original motions to dismiss were denied without prejudice to refile once the stay was lifted [Doc. 175].  The stay was lifted on June 7, 2019 [Doc. 212], the parties began "immense discovery" [Doc. 298], and defendants renewed their motions to dismiss [Docs. 213, 215, 233, 257, 282, 284, 286].  On October 28, 2019, nearly a decade after the original complaint, plaintiffs filed for leave to amend the pleadings and add parties based on newly discovered information [Doc. 297].

Plaintiffs assert that some of the "resultant harm was discovered a mere two months ago" during discovery [Doc. 298 p. 3].  As reason for the delay, plaintiffs state they have been "consumed" with litigation in this case, as counsel of record represented plaintiffs in juvenile court, chancery court, on appellate matters, in criminal court, and in child support court hearings for "voluminous accusations" [*Id.*].  Additionally, plaintiffs were "working through many emotional issues with their children" and health problems [*Id.* at 3–4].  Plaintiffs state these issues arising while preparing a response to the many motions to dismiss caused the delay in filing the instant motion.

A party may amend its pleading once as a matter of course within twenty-one (21) days of serving it or twenty-one (21) days of service of a responsive pleading or service of

a Rule 12(b), (e), or (f) motion. Fed. R. Civ. P. 15(a). If these deadlines have passed, a party may only amend its pleading with the opposing party's written consent or the court's permission. *Id.* Under Federal Rule of Civil Procedure 15(a)(2), a "court should freely give leave [to amend] when justice so requires." The decision to grant or deny an opportunity to amend is within the discretion of the District Court, but the Court should provide reasons justifying the decision. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Reasons to deny leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Id.* For a variety of reasons, plaintiffs' motion for leave to amend the complaint is denied.

First, plaintiffs do not provide enough detail in their motion or memorandum explaining the nature of or reason for the requested amendments. Under Local Rule 7.1(b), parties "shall include a concise statement of the factual and legal grounds which justify the ruling sought from the Court." Plaintiffs indicate that a need to amend their complaint arose after the children returned home and "started reporting to their parents and their therapists new facts in relation to how the Pethtel children were treated while in foster care" [Doc. 297 p. 2]. Plaintiffs state they "received information of new Defendants that needed to be added to the Amended Complaint" and list two (2) examples [*Id.*]. They then state "these newly discovered facts as well as many others need to be added to the Amended Complaint" [*Id.*] and that there is "newly discovered evidence and added defendants as

61

specified in the motion accompanying this memorandum of law" [Doc. 298 p. 5]. Plaintiffs claim to further specify the evidence in their motion but fail to do so. Given that plaintiffs add seventeen (17) new defendants[34] to the styling of the case in their proposed amended complaint, the few general comments about proposed amendments do not give sufficient notice of what the specific factual allegations or claims they seek to add by amending the complaint. Instead, the Court and defendants must closely scrutinize the two (2) documents to ascertain the differences in the current complaint and plaintiffs' proposed amended complaint. The Court therefore finds that plaintiffs do not provide sufficient grounds in their briefing to justify granting leave to amend. *See El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones." (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997))).

Second, and similarly, plaintiffs' threadbare memorandum [Doc. 298] is indicative of bad faith and dilatory motive. As the Court has noted, plaintiffs fail to identify what specifically they seek to amend changed in the complaint. In comparing the complaints, it appears that plaintiffs make changes of no consequence to the facts alleged or claims presented: words are shortened and sentences rearranged or removed, resulting in no

---

[34] The second amended complaint adds "Department of Children's Services" as another defendant. The complaint states "Defendant State of Tennessee Department of Children's Services (hereinafter referred to as DCS. . . ." [Doc. 297-1 p. 6] and later references persons only within the Tennessee DCS, and such addition of DCS generally is considered duplicative. Thus, DCS, Heather Poster, and Paul White are listed twice and are not counted again [*Id*. p. 1–3].

62

meaningful difference. While some facts are added and new parties inserted, plaintiffs fail to provide any direction as to where the changes are located. Mary Lou Seamon, who plaintiffs apparently seek to add as a defendant, is even included in the styling of the case and nowhere in the body of the complaint. Thus, defendants and the Court are left to look for what has changed and the significance, if any, of such changes. With over 100 pages in each complaint, this is an extraordinarily time-consuming task. Plaintiffs' motion and memorandum in support do nothing to ease the burden. This is consistent with the rest of the complaint wherein the parties must search through dozens of pages to find specific allegations and piece together arguments. Such meaningless grammatical or structural changes in fact add to such a burden as the complaints are not easily compared. The Court therefore finds that the proposed amended complaint and plaintiffs' filings related thereto indicate bad faith and dilatory motive.

Third, plaintiffs misconstrue of the purpose of a complaint in the little information provided for the amendment. Plaintiffs posit:

> the newly discovered evidence will assist the trier of fact in understanding the entirety of this matter [and] . . . assist the defendants' counsel in understanding all of the individuals and nuances involved in this matter. The additional defendants being named serve a purpose in allowing the Pethtel children the justice they deserve.

[Doc. 298 p. 5]. Plaintiffs now ask that "the Pethtel children receive the justice due them by this honorable court providing them the venue through which to tell their story" [*Id*. p. 5]. Rather, a complaint is neither intended to be a comprehensive list of plaintiffs' documentary evidence to be presented to the jury, nor a complete narrative of all events.

63

The complaint is simply a "short and plain statement of the grounds for the court's jurisdiction" and "a short and plain statement of the claim showing that the pleader is entitled to relief; and a demand for the relief sought." Fed. R. Civ. P. 8(a). The complaint is not the forum for plaintiffs to tell their complete story.

Fourth, the amended complaint is futile. Upon a thorough review of the two complaints, the Court finds that, other than switching the order of words or sentences, making abbreviations, and adding facts as to the parties, the complaints are largely similar. The sections listing plaintiffs' claims are substantively identical, with the exception of added defendants, small wording changes, and a paragraph stating parties should have known defendant Erin Schad practiced law without a license [Doc. 297-1 ¶ 418]. As discussed in this opinion, the legal claims as to all defendants at issue will be dismissed. Many claims are being dismissed for reasons that could have been avoided with better pleadings. While plaintiffs' situation is not exactly "repeated failure to cure deficiencies by amendments previously allowed" under *Foman*, 371 U.S. at 182, it is a failure to cure deficiencies when they had over eight (8) years' notice of the deficiencies as identified in the original motions to dismiss before the stay of the case.

Plaintiffs state that the amendment "will allow the child Plaintiffs in this matter to have their issues heard and receive the justice they deserve which is not a futile matter" [Doc. 298 p. 3]. Futility in this context does not refer to the importance of the events at issue or relief being sought. It instead refers to the legal impact of the changes in the amendment, as "[i]t is well settled that the district court may deny a motion for leave to

64

amend a complaint if such complaint, as amended, could not withstand a motion to dismiss." *Neighborhood Dev. Corp. v. Advisory Council on Historic Pres.,* 632 F.2d 21, 23 (6th Cir. 1980). As the proposed complaint does not cure any of the legal defects outlined in the defendants' original motions to dismiss, and the claims are identical to those raised in the first amended complaint in all relevant ways, this amendment is futile.

Fifth, plaintiffs' motion is quite delayed, resulting in significant prejudice to the defendants and undue burden on the Court. "[A] party must act with due diligence if it intends to take advantage of the Rule's liberality." *Pittman v. Experian Info. Sols.,* 901 F.3d 619, 641 (6th Cir. 2018). "Ordinarily, delay alone, does not justify denial of leave to amend. . . . At some point, however, delay will become undue, placing an unwarranted burden on the court, or will become prejudicial, placing an unfair burden on the opposing party." *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002) (quotations omitted).

To determine what constitutes prejudice, courts look at whether the new claims would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial; significantly delay the resolution of the dispute; or prevent the plaintiff from bringing a timely action in another jurisdiction." *Phelps v. McClellan*, 30 F.3d 658, 662–63 (6th Cir. 1994). The Sixth Circuit "has required at least some significant showing of prejudice to deny a motion to amend based solely upon delay. . . and [t]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Pittman*, 901 F.3d, at 641.

65

As previously discussed, plaintiffs state various family and medical reasons in addition to the demands of ongoing litigation as reasons for their delay. Plaintiffs acknowledged that "some of the information was received years ago" and that during the stay, they "received information of new Defendants that needed to be added" [Doc. 297 p. 2]. Instead of acting promptly, they waited until the day of the deadline to file the amended complaint.

While not an untimely motion, this is undue delay and causes significant prejudice to the parties. At the time of this motion, the parties only had thirty (30) days left until the close of discovery [Doc. 138].[35] Significant discovery had already begun in this case, and adding more defendants and facts would require delay as the parties would have to become acquainted with the case, file their own motions to dismiss, and continue the discovery process. As the events of this action occurred over a decade ago, it is unlikely that many of the new parties still have documentation or records from the time period.

---

[35] The relationship of a case and its completion of discovery is often a significant factor in determining undue delay. However, unlike in this case, amendments typically add legal claims and, in some cases, add parties to the new claims. Thus to reopen discovery for said claims would be inappropriate, and denial is not an abuse of discretion. *See, e.g. Pittman v. Experian Info. Sols.*, 901 F.3d 619, 641 (6th Cir. 2018) (holding no abuse of discretion when plaintiff added a party, raised additional counts, and discovery had closed five months prior); *Siegner v. Twp. of Salem*, 654 F. App'x 223, 228–29 (6th Cir. 2016) (holding no abuse of discretion where discovery had closed two (2) months prior and plaintiff was long aware of the basis for the claim to be amended); *Duggins v. Steak'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (holding no abuse of discretion where plaintiff was aware of the basis of the claim for many months, discovery had closed, dispositive motion deadline had passed, and a motion for summary judgment had been filed). Here, plaintiffs seek to amend the complaint to add more factual allegations and parties without amending the claims, but the progression of the case to this stage in discovery is still indicative of delay and the prejudice defendants would face to integrate the new defendants into the case.

66

The prejudice resulting from the delay is underlined by the statute of limitations for many of plaintiffs' claims against new defendants. For example, "[f]ederal district courts apply state statutes of limitations in proceedings brought under 42 U.S.C. § 1983." *Pendergrass v. Sullivan*, No. 1:19-cv-115, 2019 WL 4264377, at *2 (E.D. Tenn. Aug. 14, 2019) (quoting *Cooper v. Rhea Cnty., Tenn.*, 302 F.R.D. 195, 199 (E.D. Tenn. 2014)). Although § 1983 has no statute of limitations on its own, the applicable limitations period is the same period that "state law provides for personal injury torts, which is one year in Tennessee." *Id.* (citing Tenn. Code Ann. § 28-3-104).

Federal law controls when the civil rights cause of action accrues. *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000). "The statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action. A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984) (citations omitted). Additionally, courts "have looked to what event should have alerted the typical lay person to protect his or her rights." *Hughes*, 215 F.3d at 548 (citing *Dixon v. Anderson*, 928 F.2d 212, 215 (6th Cir. 1991)).

While plaintiffs state "some of the resultant harm was discovered a mere two months ago" [Doc. 298 p. 3], the focus is not on the residual harm of an event, but the injurious event itself and when plaintiffs should have been put on notice to continue investigation. *Hughes*, 215 F.3d at 548. In this case, that time was long ago. Plaintiffs state that "some of the information was received years ago" and the "accumulation over time of new

67

evidence . . . compelled the Plaintiffs to file this motion" [Doc. 297 p. 2]. However, the passage of time does not work in plaintiff's favor. The Court discusses the statute of limitations not for the purpose of resolving the motion, but to underscore the legal and practical significance of swift action and the undue burden and prejudice such delays can cause. The parties sought to be added to this case reportedly acted and caused injury far over one (1) year ago and have been uninvolved in this case for the years it has been pending. To add them now would result in incredible prejudice.

These findings, considered cumulatively, strengthen the Court's conclusion as the proposed amended complaint satisfies nearly every basis identified in *Foman* as justification to deny leave to amend. Consequently, Plaintiffs' Motion for Leave to Amend Pleadings and Add Parties Based on Newly Discovered Information [Doc. 297] is **DENIED.**

## IV.    Conclusion

For the reasons discussed herein, the Court lists the following disposition of the pending motions and remaining issues:

- All claims against defendants State of Tennessee Department of Children's Services, David Clark, Clinch Valley Children's Center, Foothills Care, Inc., Solution Source, Omni Vision, Shannon Forrester, Helen Burleson, Katie Butler, Cynthia Koehler, Samantha Cardwell, Erin Schad, Sean Morehead, Julie Rotella, Pamela Becker, Margaret Durgin, Gail Clift, Stephanie Huckabey, Jay Huckabey, Hazel Bumgardner, Martha Ruff, Stephen Ruff, Kimbra McKinley, Ryan Peters, Stacey Pratt, Leigh Anne Goldstine, Stella Hamilton, Anderson County Health Department, Pediadvocates, Heather Poster, and Terry Ryan have been dismissed. Accordingly, the motions to dismiss [Docs. 213, 215, 233, 257, 282, 284, 286] are **GRANTED**. Federal claims against the defendants are **DISMISSED with prejudice**; plaintiffs

68

will not be granted leave to address the deficiencies in their complaint.  State law claims are **DISMISSED without prejudice**.

- Clift, Omni, and Pediadvocates's requests for attorney's fees and costs pursuant to 42 U.S.C. § 1988 are **DENIED without prejudice**.

- McKinley, Peters, and Solution Source's Motion to Compel [Doc. 292] and Motion for Summary Judgment [Doc. 294]; the Children's Center, Durgin, and Pratt's Motion to Exclude or Limit the Testimony and Opinions of Plaintiffs' Experts [Doc. 291] and plaintiffs' Motion for Leave to File Excess Pages and Extension of Time to File Answer to Doc. 291 [Docs. 303, 304] are **DISMISSED as moot**.

- Plaintiff's Motion to for Leave to Amend Pleadings and Add Parties Based on Newly Discovered Information [Doc. 297] is **DENIED**.

- As the Court has issued a ruling on all pending dispositive motions [Doc. 302], the stay in this case is hereby **LIFTED**.

- The remaining defendants in this matter are: Anderson County CASA, Diane Renfroe, Steven Abner, Josh Cardwell, Joseph Gilvin, Harold J. Crowley, Wiley Maloney, Jason Leach, Jonathan Acker, Wally Braden, and Paul White.

**IT IS SO ORDERED.**


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

Case 3:10-cv-00469-TAV-HBG   Document 324   Filed 11/20/20   Page 69 of 69   PageID #: 3507