UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

KATHLEEN E. PETHTEL, individually,   )
TOBIAS M. PETHTEL, individually, and   )
M.M.P., C.L.P., K.D.P., E.L.P., S.A.P.,   )
A.E.P., and N.A.P., by their parents   )
KATHLEEN E. PETHEL and   )
TOBIAS M. PETHTEL, as next of friends,   )
                                                          )
              Plaintiffs,                           )
                                                          )
v.                                                        )          No.:    3:10-CV-469-TAV-HBG
                                                          )
ANDERSON COUNTY CASA,            )
DIANE RENFROE,                            )
STEVEN ABNER,                             )
JOSH CARDWELL,                           )
JOSEPH GILVIN,                             )
HAROLD J. CROWLEY,                   )
WILEY MALONEY,                          )
JASON LEACH,                                )
JONATHAN ACKER,                        )
WALLY BRADEN, and                      )
PAUL WHITE,                                  )
                                                          )
              Defendants.                          )

## MEMORANDUM OPINION

Defendants Steven Abner, Josh Cardwell, Joseph Gilvin,[1] Harold J. Crowley, Wiley

Maloney, Jason Leach, Jonathan Acker, Wally Braden, and Paul White filed a motion for

summary judgment [Doc. 334], and defendants Anderson County Court Appointed Special

---

[1]  The Court notes the recently-filed Suggestion of Death of Joseph Gilvin [Doc. 362].
Because this opinion dismisses the remaining claims in this case, including the claims against
defendant Gilvin, no further action needs to be taken at this time with respect to the suggestion
of death.

Advocate ("CASA") and Diane Renfroe have filed a motion to dismiss [Doc. 344]. Plaintiffs responded to the motion for summary judgment [Docs. 346, 348] and the motion to dismiss [Doc. 359]. Defendants replied to plaintiffs' response to the motion for summary judgment [Doc. 352]. Defendants did not, however, reply to plaintiffs' response to the motion to dismiss, and the time for a reply has passed. *See* E.D. Tenn. L.R. 7.1(a), (c) (noting reply briefs are not necessary, but if one is to be filed, it must be filed no later than seven days after service of the answering brief). The motions are now ripe for resolution. For the reasons stated below, all of plaintiffs' claims against these defendants[2] must be dismissed, and the Court will therefore **GRANT** defendants' motions [Docs. 334, 344] and **DISMISS** this case.

## I. Background

Plaintiffs have sued forty-five defendants, eleven of whom remain,[3] seeking a wide range of relief [Doc. 6 ¶¶ 538–44]. Plaintiffs' 114-page complaint[4] contains 544 paragraphs, many of which include multiple subparts [*Id.*]. Plaintiffs assert various claims, including claims under 42 U.S.C. § 1983 for violations of the First, Second, Fourth, and Fourteenth Amendments to the United States Constitution; 42 U.S.C. § 1985 for conspiracy to commit § 1983 violations; the Adoption Assistance and Child Welfare Act as amended by the Adoption and Safe Families Act of 1997; the Americans with

---

[2] In this opinion, "defendants," unless otherwise specified, means those being addressed in that section.

[3] The Court dismissed the other defendants in prior rulings [Docs. 253, 319, 324].

[4] "Complaint" refers to Document 6, plaintiffs' amended complaint.

2

Disabilities Act; the Tennessee Constitution; Tenn. Code Ann. §§ 29-24-101 to -104 (libel and slander); Tenn. Code Ann. § 39-13-101 (asserting negligence per se pursuant to the penal statute for assault); and the common law (intentional infliction of emotional distress, false imprisonment, assault, negligence, and invasion of privacy) in addition to claims asserting violations of the Tennessee Department of Children's Services' policies and the Brian A. Settlement Agreement [Doc. 6 ¶¶ 330–531].

Due to the lengthy nature of the factual background and complaint in this case, details of relevant allegations and facts will be addressed as needed. As a brief overview,[5] plaintiffs Tobias and Kathleen Pethtel adopted seven minor children [*Id*. 6 ¶ 1]. On November 10, 2009, one of the minor Pethtel children made a 911 prank call, which drew officers from the Anderson County Sheriff's Department to the Pethtel home [*Id*. ¶¶ 2–3]. Some of the deputies reportedly saw a bruise on the face of one of the children, which the child explained as a bruise from a bicycle accident [*Id.* ¶ 5]. The deputies called the State of Tennessee Department of Children's Services ("DCS") to plaintiffs' home [*Id.*]. That same day, after some investigation, six of the minor children were removed from the home and placed in two different homes [*Id.* ¶ 13]. DCS also removed the seventh minor child from military school in Florida [*Id.* ¶¶ 13–14]. DCS, through defendant Koehler, filed a Petition for Dependency and Neglect and a Protective Custody Order in the Anderson County Juvenile Court, alleging the children were neglected [*Id. ¶* 15]. The plaintiff

---

[5] For the purpose of a motion to dismiss, the Court takes all the factual allegations in the complaint as true. *Papasan v. Allain*, 478 U.S. 265 (1986). Here, the Court refers to the complaint but notes that it will review the evidence as presented by the parties later in this opinion.

3

parents were later found guilty of one count of child abuse in Anderson County criminal court and sentenced; they filed a waiver of the right to appeal and right to a new trial [Doc. 206 p. 2; Doc. 220-1 pp. 1–2].

All of plaintiffs' claims arise out of this law enforcement visit to the plaintiffs' home and ensuing actions by local law enforcement, DCS, and other individuals and agencies named in the complaint for their treatment of plaintiffs and involvement in plaintiffs' familial relationships.

## II.     Motion for Summary Judgment

### A.     Plaintiffs' Discovery Motions

Plaintiffs "request that discovery be completed prior to a ruling being made on Defendants' summary judgment motion" [Doc. 346 p. 3].[6] On March 19, 2021, the Court issued an Amended Scheduling Order [Doc. 325] setting the parties' discovery deadline ninety days before trial. The parties filed a Joint Status Report requesting the discovery deadline to be extended [Doc. 337], but no motion for an extension was filed. This case has been pending for nearly eleven years. The present motion is the first motion for any kind of discovery extension since the scheduling order [Doc. 325], and it was filed after the discovery deadline had passed.

The Court finds that the parties have had over a decade to prepare for or conduct discovery. The parties did not request extensions of the deadlines when they were set in

_____

[6] The Court notes plaintiffs never actually filed a motion for a discovery extension. Nevertheless, the Court will treat plaintiffs' request as a motion.

4

March.  Instead, they waited until the day of these deadlines, ninety days before trial, to file a status report.  The Court also notes that plaintiffs previously requested an extension of the deadline to respond to defendants' motion for summary judgment [Doc. 341] but made no mention of a discovery extension.  The Court granted plaintiffs a brief extension to file a response to the motion for summary judgment but stated that "[n]o further extensions of the dispositive motion deadline or deadline for responses will be granted absent extraordinary circumstances" [Doc. 343 p. 2].  Plaintiffs have not presented extraordinary circumstances to justify an extension of the discovery deadline, particularly considering the already-lengthy amount of time plaintiffs have had to prepare and the failure of the plaintiffs to file a motion before the deadlines expired.

Additionally, plaintiffs recently filed a Motion for Continuance [Doc. 366], and defendants responded [Doc. 370].  In that motion, plaintiffs indicate summary judgment is improper when a nonmovant has had an inadequate opportunity for discovery [*Id.* at 11].  The Court will treat this language as a motion for the Court to allow additional time for discovery under Federal Rule of Civil Procedure 56(d).

Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d).  "Pursuant to [Rule 56(d)], a party opposing a motion for summary judgment is allowed to state that he or she is unable to present facts essential to justify the party's

opposition." *Wallin v. Norman*, 317 F.3d 558, 564 (6th Cir. 2003). "[T]he district court may permit further discovery so that the nonmoving party can adequately oppose the motion for summary judgment." *Id.* The Sixth Circuit "has interpreted [Rule 56(d)] as requiring a party opposing a summary judgment motion to file an affidavit that 'indicates to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information.'" *Gettings v. Bldg. Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300, 305 (6th Cir. 2003) (alterations omitted) (citation omitted). "[T]o fulfill the requirements of [Rule 56(d)]," the nonmovant "must state with some precision the materials he hopes to obtain with further discovery, and exactly how he expects those materials would help him in opposing summary judgment." *Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004) (quotation marks omitted).

"The importance of complying with [Rule 56(d)] cannot be overemphasized." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000). It is "a 'carefully crafted' rule that serves as a vehicle through which the non-movant meets his 'obligation to inform the district court of his need for discovery.'" *Id.* (citation omitted). "In the absence of a sufficient affidavit, there is no justification for the district court's determination that a motion for summary judgment would be premature until the close of discovery." *Summers*, 368 F.3d at 887.

The Court finds that plaintiffs have already had adequate opportunity for discovery. This case has been pending for eleven years, and plaintiffs took no discovery during this time. It is true the Court has issued various stays, but despite opportunities to take

6

discovery after the stays were lifted, plaintiffs requested no discovery. Plaintiffs had ten months after they filed their complaint to conduct discovery before the Court's first stay. And plaintiffs had another nine months to conduct discovery following the Court's decision to lift its most recent stay in November 2020.

Accordingly, plaintiffs' motions to delay ruling [Doc. 346 p. 3] and for additional time for discovery [Doc. 366] are **DENIED**. Correspondingly, plaintiffs' motion to compel [Doc. 365] is **DENIED AS MOOT**.

### B.     Legal Standard

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court must draw "all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The moving party bears the burden of establishing that no genuine issues of material fact exist and may meet this burden by affirmatively proving their case or by highlighting the absence of support for the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. 317). To establish a genuine issue as to the existence of a particular

element, the nonmoving party must point to evidence in the record, including depositions, documents, affidavits, and other materials, upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also* Fed. R. Civ. P. 56(c)(1)(A). There must be more than a "mere scintilla of evidence" to withstand a motion for summary judgment, *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007) (citation omitted), and any genuine issue of fact must also be material; that is, it must involve "facts that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. The Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Id.* at 249. If a reasonable juror could not find for the nonmovant, the Court must grant summary judgment. *See Celotex*, 477 U.S. at 323.

## C. Analysis

The Court notes defendants' footnote stating that plaintiffs' memorandum in opposition was not filed by the Court's deadline, having been filed in the early morning hours of the next day [Doc. 352 p. 1 n.2]. The Court also notes plaintiffs' affidavit stating that plaintiff Kathleen Pethtel had difficulties with the electronic filing system [Doc. 353]. The Court will therefore consider plaintiffs' memorandum [Doc. 348].

However, the Court will not consider all filings attached to the memorandum. Plaintiffs had moved for leave to file excess pages regarding its response brief without specifying a requested number of pages [Doc. 340]. The Court granted this motion,

allowing a generous extension and permitting plaintiffs to file a brief of "no more than **51 pages**" [Doc. 342]. Plaintiffs' response is exactly fifty-one pages [Doc. 348].

Yet plaintiffs attached many additional files to their memorandum. The first is a thirteen-page "Fact Chart in Support of Memorandum" that presents various facts that defendants stated, their citations to the record, and plaintiffs' account of the facts [Doc. 348-1]. Rather than presenting plaintiffs' account of the facts in the memorandum, they included it in a separate document—the chart—and attached it as an exhibit. The purpose of exhibits is to present evidence, generally in the form of transcripts, reports, and other documents. They should not, however, present continued argumentation and briefing because doing so in effect extends the page limit. The Court therefore finds plaintiffs filed the chart in violation of the Court's Order and in an attempt to circumvent the local rules and exceed the number of pages permitted, which was already more than double the ordinary amount. *See* E.D. Tenn. L.R. 7.1(b) ("Briefs . . . shall not exceed 25 pages in length . . . ."). The Court therefore will not consider Document 348-1.

Defendants move for summary judgment regarding plaintiffs' civil conspiracy claims under §§ 1985(3)[7] and 1986 and plaintiffs' § 1983 claims. The Court finds that the civil conspiracy claims must be dismissed for the same reasons articulated in the Court's November 2020 order [Doc. 324 pp. 18–20]. Defendants are therefore entitled to summary judgment on those claims.

---

[7] Although plaintiffs do not specify a claim under § 1985(3) and generally assert § 1985 claims, the first two subsections of § 1985 relating to preventing an officer from performing duties and obstruction of justice are inapplicable here.

9

The remaining federal claims are all brought under 42 U.S.C. § 1983. It provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Plaintiffs must plead and prove two elements to state a cause of action: (1) that a person has deprived them of a federal right; and (2) that the person did so under color of state law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970). Plaintiffs have alleged a variety of § 1983 claims.

The Court notes that many claims may be resolved for the same reason. The Sixth Circuit has held that because "[a]llegations of *respondeat superior* do not sustain a § 1983 claim against state employees in their individual capacities, . . . officials are personally liable for damages under that statute 'only for their own unconstitutional behavior.'" *Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010) (citation omitted). The Court "must analyze separately whether [plaintiff] has stated a plausible constitutional violation by each individual defendant." *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 564 (6th Cir. 2011). "[T]he collective acts of defendants cannot be ascribed to each individual defendant." *Reilly v. Vadlamudi*, 680 F.3d 617, 626 (6th Cir. 2012). In other words, "damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each*

10

defendant did to violate the asserted constitutional right." *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008).[8]

Accordingly, when plaintiffs fail to allege sufficient facts demonstrating how each defendant's actions violated plaintiffs' rights, the Court should grant summary judgment for defendants. *Id.* The Sixth Circuit in *Lanman* held summary judgment in favor of some defendants was proper where they had "limited involvement" and were simply present at the scene and administered a drug. *Id.* at 687. The Sixth Circuit held that such limited involvement "does not subject [defendants] to individual liability for any alleged constitutional violation that occurred" and that "presence at the scene and administration of [a drug] are insufficient to support a finding that [the defendants] violated [the plaintiff's] constitutional rights." *Id.* When one defendant was "present and perhaps involved in [the event giving rise to the action], [the] plaintiff ha[d] failed to allege, with any particularity, the unconstitutionality of [the defendant's] actions" and therefore the court granted summary judgment. *Id.*

Plaintiffs here often have not alleged facts with particularity that demonstrate how each individual defendant violated plaintiffs' rights. It seems plaintiffs in one instance attempted to allege facts against specific defendants, but the brief they filed suggests they could not do so as it inserted asterisks where the defendants' names should have been

---

[8] Plaintiffs take issue with this line of cases, stating that defendants rely on them when they involve "lack of medical care to incarcerated or mental hospital patients" [Doc. 348 pp. 9–11]. However, nothing in the cases suggests these principles only apply to § 1983 claims in those contexts.

11

[Doc. 348 p. 29 ("Defendants *, * and * . . . .")]. Therefore, the Court finds that defendants are entitled to summary judgment and will discuss the claims in the order presented by defendants' brief [Doc. 336].

### 1. Claims by Children

Defendants discuss three claims brought on behalf of the children: (1) the seizure of N.A.P. from military school; (2) the seizure of the other children after they ran into the woods; and (3) the seizure of the children by removing them from the home.

First, defendants discuss the removal of N.A.P. from military school. Defendants state that they were not present on the day of his removal and that DCS[9] rather than defendants removed him [Doc. 336 pp. 11–12]. The complaint does not discuss how each individual defendant seized N.A.P. The only facts specific to this seizure in the complaint state, "DCS by and through Cynthia Koehler removed N.A.P. from military school in Florida where the minor child was progressing" and "DCS removed minor child N.A.P. from his military school in Florida and he was 'interviewed' by Stacey Pratt for more than five (5) straight hours during which he was pressured to adopt DCS's version of the facts" [Doc. 6 ¶¶ 14, 168]. Thus, plaintiffs have set forth no evidence indicating defendants seized N.A.P.

Second, defendants argue they are entitled to summary judgment as to plaintiffs' claim that defendants seized the plaintiff children after they ran out of their house into

---

[9] The Court notes that all claims against the Tennessee Department of Children's Services have already been dismissed [Doc. 324].

12

woods and toward a creek [Doc. 336 p. 13]. Defendants state that to the extent they seized the children, such a seizure was reasonable due to safety concerns of the children being in the woods at night near a creek after heavy rain [*Id.*]. The only facts in the complaint related to these events are that "[l]aw enforcement officers unlawfully pursued the children on foot and with the Anderson County Sheriff Department's K-9 by and through Officer Jonathan Acker" [Doc. 6 ¶ 9]. Neither the complaint nor plaintiffs' response clearly alleges that Jonathan Acker ever actually seized the children when he pursued them in the woods. *See California v. Hodari D.*, 499 U.S. 621, 625–26 (1991) (noting a seizure occurs only if an officer applies physical force or makes a show of authority and the subject actually acquiesces to that show of authority). Therefore, plaintiffs have not provided any evidence that defendants seized the children in the woods.

Third, defendants discuss the removal of the children from the home [Doc. 336 pp. 15–16]. Defendants state that the children were removed by DCS after DCS concluded the children were abused [*Id.*]. The complaint states:

> On November 10, 2009, instead of offering services to the family, DCS by and through Cynthia Koehler and Samantha Cardwell removed all six (6) minor Pethtel children that were living in Tennessee at the time, and placed them in two (2) different homes with no attempt at the multiple approaches to provide a safety plan and assist the children and the parents with their issues

and that "[a]ll of the Pethtel children with the exception of N.A.P. were seized and removed from the Pethtel home within a few hours of the arrival of DCS" [Doc. 6 ¶¶ 13–14]. Again, then, plaintiffs have set forth no evidence that defendants seized the children.

13

For the reasons stated above, the Court finds that the complaint fails to particularly allege how each of defendants violated plaintiffs' constitutional rights as to these alleged seizures. No evidence before the Court suggests there was a seizure of any of the children, so no reasonable juror could find in plaintiffs' favor. *See Anderson*, 477 U.S. at 248. Even more, the section of the complaint detailing the unlawful seizure claim [*Id.* ¶ 352(a)] does not mention any specific actions of any specific defendants. Indeed, the complaint lists these violations as being committed by other defendants that have already been dismissed. *See Lanman*, 529 F.3d at 684. Thus, defendants are entitled to summary judgment on all three unlawful seizure claims by the children.

### 2. Claims by Parents

#### a. Seizure of Mrs. Pethtel with Handcuffs

Defendants argue they are entitled to summary judgment on plaintiffs' § 1983 claim based on the seizure of Mrs. Pethtel when they placed her in handcuffs [Doc. 336 p. 16]. Defendants state only defendants Steven Abner and Harold Crowley were involved, and plaintiffs do not provide otherwise, so the claims against the other defendants must be dismissed. *See Lanman*, 529 F.3d at 684.

The complaint states that "[p]laintiffs Tobias and Kathleen Pethtel were seized by state actors Steven Abner, Joseph Gilvin, Josh Cardwell, Harold James Crowley, Jonathan Acker, Wiley Maloney, Wally Braden, Jonathan Acker [sic] and other officers of the Anderson County Sheriff's Department in November 2009 without probable cause" [Doc. 6

14

¶ 352(b)(4)]. The rest of this portion describing an alleged unlawful seizure of the plaintiff parents [*Id.* ¶ 352(b)] equally does not include references to defendants.

The Court finds that the only defendants that plaintiffs have sufficiently alleged were involved are Steven Abner and Harold Crowley [Doc. 6 ¶ 4 ("Steven Abner handcuffed Kathleen Pethtel and shoved her down into a dining room chair."); Doc. 348 pp. 15–16; Doc. 348-4 p. 8 (noting both Abner and Crowley forced Mrs. Pethtel into a chair and handcuffed her)]. Moreover, the generalized paragraph quoted above stating that plaintiffs were seized by all defendants without reference to this specific seizure may not be attributed to each individual defendant. *Reilly*, 680 F.3d at 626.

Defendants concede that Mrs. Pethtel was seized but posit that the handcuffing was a *Terry* stop requiring only reasonable suspicion rather than probable cause [Doc. 336 p. 18]. *See generally Terry v. Ohio*, 392 U.S. 1 (1968). The Sixth Circuit has stated that "*Terry*, a limited exception to the normal requirements of probable cause, permits a police officer briefly to detain a person or property for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). Therefore, the first question is whether the law enforcement officers were aware of specific and articulable facts that gave rise to reasonable suspicion, examining the totality of the circumstances to determine reasonableness. *Id.* If the basis was proper, the second question is to determine "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the

15

officials' conduct given their suspicions and the surrounding circumstances," which includes consideration of whether the detention was sufficiently limited in time and the investigative means used were the least intrusive reasonably available. *Id.* (alteration in original) (citation omitted). "A determination of reasonableness depends on a balance between 'the need to search [or seize] against the invasion which the search [or seizure] entails.'" *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 590 (6th Cir. 1994) (alteration in original) (citation omitted).

Defendants put forth the state criminal trial testimony of Crowley and Abner [Doc. 334-2] to describe the relevant events. The officers responded to plaintiffs' home after there were many 911 hang-up calls that day and the day prior [*Id.* at 23]. Mrs. Pethtel stated that her children were playing with the phone and must have dialed 911 before hanging up [*Id.* at 7–8]. Crowley told them not to have the children play with the phone, and he returned to his car [*Id.* at 8]. Crowley stated that during this first conversation, Mrs. Pethtel stepped onto the front porch [Doc. 334-2 p. 17].

Defendant Abner then arrived, spoke with Crowley, and they then returned to the house to issue a citation for misuse of 911 [*Id.* at 9]. The officers knocked on the door, and Mrs. Pethtel opened it [*Id.* at 25]. Abner asked if there was a place where they could sit down and write or "something to that effect"; he did not recall if she said anything [*Id.*]. Crowley stated that they requested her identification for the purpose of issuing the citation; "[s]he said, my ID is in the kitchen and she turned and walked into the kitchen and [the officers] followed her in the kitchen area" [*Id.* at 9]. The officers concede they did not

16

have a warrant or explicit permission to enter but explain that "[s]he didn't tell us not to come in. She had the door open, we entered behind her and followed her into the kitchen area" [*Id.* at 18, 31]. The officers "took it as an invitation" [*Id.* at 31].

When in the kitchen, a female child entered, and Crowley "noticed that she had some bruising on her face, . . . both hands, . . . both arms and the lower portion of her legs" [*Id.* at 10]. Crowley asked how the child acquired the bruises, and Mrs. Pethtel stated she had fallen off a bicycle [*Id.*]. Crowley asked to speak to the child, but Mrs. Pethtel and the child went into another room before the child returned with long sleeves and pants [*Id.* at 10–11]. Crowley asked if the child could raise her sleeves so he could see her arms, but when the child began to do so, Mrs. Pethtel grabbed the child and "screamed at [Crowley] that [he was] not looking at [her] child" [*Id.* at 11–12]. "Her tone changed instantly. It was a loud scream. . . . At that time she started jumping around the kitchen. . . . Her demeanor totally changed. She became irate" [*Id.* at 12]. Crowley told her it was his obligation to contact DCS, and "she escalated even further[,] . . . jumping around the kitchen[.] . . . [S]he was just yelling and screaming and she was asked several times to calm down. She didn't calm down at that time" [*Id.* at 12–13]. Abner described her behavior, stating, "[s]he was loud, she was screaming, hollering, running all around the kitchen. She pulled her dress up and showed us some kind of . . . colostomy bag[.] . . . She was pulling the drawers open to all the kitchen cabinets" [*Id.* at 28]. The officers testified that this behavior concerned them and that they handcuffed her "because [they] felt threatened.

17

[They] felt like she was out of control [and that] she was going to pull a knife or gun" because it was "that intense" [*Id.*].

> With her behavior it came to the point to where Deputy Abner and [Crowley] handcuffed her and asked her to calm down repeatedly. She would not calm down, she was placed in handcuffs and asked to have a seat at the kitchen table. . . . After a few minutes she calmed down and the handcuffs were removed

[*Id.* at 13].

Defendants therefore assert that they had "reasonable suspicion that Mrs. Pethtel could potentially harm them or herself based upon her irate and erratic behavior" and that the brief seizure of only a few minutes was reasonable [Doc. 336 p. 19].

Plaintiffs refute defendants' arguments as to both reasonable suspicion and reasonableness of the scope of the seizure. As to reasonable suspicion, plaintiffs initially appear to argue that a seizure based on past child abuse would be unreasonable because the analysis is more critical for investigations of past criminal activity than for investigations of ongoing conduct [Doc. 348 pp. 12–13 (citing *United States v. Hudson*, 405 F.3d 425, 437 (6th Cir. 2005))].

Addressing defendants' argument that Mrs. Pethtel caused a threat to the officers' safety, plaintiffs state that "Mrs. Pethtel was physically incapable of yelling, screaming, and running and jumping around as alleged in the factual scenario" because of her varied health issues [*Id.* at 15]. While plaintiffs attached portions of her medical records, this does not demonstrate that she was indeed incapable of those behaviors. Plaintiffs argue that it was unreasonable to believe the approximately five-foot-tall, "medically fragile" woman

18

could threaten the officers,[10] particularly considering they did not record threats in any official documents [Doc. 348 p. 16]. However, plaintiffs do not cite evidence that supports this contention in the record.

Plaintiffs further argue that the child was wearing clothes, which were not pulled down until DCS arrived, and that it was "impossible for anyone to see bruising other than on her face and hands," citing the complaint [*Id.* at 17].

As previously stated, this is insufficient to defeat summary judgment. Plaintiffs must point to evidence in the record such as depositions, affidavits, or other materials upon which a reasonable finder of fact could find in its favor. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c)(1)(A). "To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995) (citation omitted). "Essentially, a motion for summary judgment is a means to 'challenge the opposing party to 'put up or shut up' on a critical issue.'" *Id.* (citation omitted). Here, plaintiffs have not put forth any evidence that would defeat defendants' arguments or demonstrate a genuine issue of material fact as to whether the officers reasonably could have viewed plaintiff's erratic behavior as threatening.

---

[10] Defendants reply that no matter whether she was medically fragile, the officers were unsure for what Mrs. Pethtel was looking and feared for their safety based on her actions [Doc. 352 p. 12].

19

Based on the evidence regarding Mrs. Pethtel's behavior provided by defendants and not refuted by plaintiffs' evidence, the Court concludes there is no genuine dispute of material fact and that, as a matter of law, the officers had reasonable suspicion to believe criminal activity was about to occur, namely that the officers or the children could have been in danger.[11] The basis for the *Terry* stop was therefore proper, and the officers were justified in detaining Mrs. Pethtel.

Plaintiffs next argue the initial entry into the Pethtel home violated the Fourth Amendment and therefore the actions following the entry were unreasonable [Doc. 348 p. 15]. Plaintiffs explain Mrs. Pethtel was not a fleeing misdemeanor subject, defendants do not argue there were exigent circumstances to enter the home, and there "was absolutely no reason to enter the Pethtel's home without a warrant" [*Id.* at 13–14]. Plaintiffs argue Mrs. Pethtel did not invite them into the home and that Abner "forced his way into the home after opening the screen door to gain access" and cite to the complaint [*Id.* at 13]. Plaintiffs cite no evidence in support of this assertion.

Attempting to argue that Mrs. Pethtel's other behaviors demonstrated lack of consent to enter the home, plaintiffs highlight the Anderson County Sheriff's Department

---

[11] Defendants' briefing implies that the crimes of which Mrs. Pethtel was suspected were potential future crimes against an officer such as assault or battery. The Court finds that the officers had reasonable suspicion to detain Mrs. Pethtel for a brief time to investigate child abuse as well based on the repeated 911 calls in combination with the bruising of the child and response after inquiry. The officers reasonably could have believed that a person was in distress as recently as that morning based on the calls and that abuse may have continued had they left, particularly considering Mrs. Pethtel's agitated state. The detention in the manner performed would have been necessary for officer safety while investigating this matter as inquiries elicited an intense response from Mrs. Pethtel. Therefore, the Court finds that the officers had reasonable suspicion to conduct a *Terry* stop based on the potential future criminal activity of both harm to an officer or child abuse.

20

incident report, which states that after being asked to look at the child, she "demanded to talk to her attorney" [Doc. 348-17 p. 3]. Plaintiffs state Mrs. Pethtel closed doors to keep the deputies out during their stay but do not cite any evidence of such in the record [Doc. 348 p. 17]. She avers she attempted to call her husband and cites to AT&T records and the Findings of Fact from the Criminal Court of Tennessee, which state, "Officer Crowley testified they never attempted to obtain consent. There was never a warrant" [Doc. 348 pp. 16–17 (citing [Doc. 348-11 p. 1, Doc. 348-18])]. Though, the excerpt does not make it clear to which portion of the day's events this is referring.

The Court finds these events do not create a genuine dispute of material fact and that the officers' initial entry was proper as a matter of law. Plaintiffs refer to the entire length of the officers' stay at the home whereas the only relevant actions relate to the officers' initial entry [Doc. 348 p. 17 (referencing that the officers stayed at the Pethtel home for over five hours)]. Considering the exchange between the officers and Mrs. Pethtel on the porch of the home, as a matter of law, the officers could have reasonably concluded she gave implied consent to enter.

The Sixth Circuit handled a similar case in *United States v. Carter*, 378 F.3d 584 (6th Cir. 2004). There, officers asked to enter the defendant's hotel room, the officers did not recall if he responded, the defendant moved away from the door and backed up, and the officers entered. *Id.* at 588. The Sixth Circuit held that the defendant was asking them "to hold as a matter of law that consent must be given verbally, perhaps by some 'magic words' formula." *Id.* at 589. The court declined to do so and noted, "[a]lthough a man's

21

home is his castle, trumpets need not herald an invitation. The police may be kept out or invited in as informally as any other guest." *Id.* Applied to those facts,

> [t]he investigating officers were instantly recognizable as policemen when [defendant] opened the door. They properly asked permission to enter, and [defendant] stepped back, letting them in. Any ordinary caller, under like circumstances, would understand assent to have been given, and the police are not held to a higher standard in this regard than an ordinary person. *Robbins v. MacKenzie*, 364 F.2d 45, 49 (1st Cir. 1966) ("An ordinary person who knocks on a door and receives assent may properly consider himself an invited guest. . . . Similarly, the fourth amendment . . . does not require [a police officer] to be clairvoyant.").

*Id.* at 588. When the officers asked if they could enter, the defendant was not "threatened, coerced, or tricked," and nothing indicated that he was unaware of his right to refuse entry by either verbally denying entry or closing the door, so the Sixth Circuit held that though his decision "may have been rash and ill-considered, . . . that does not make it invalid." *Id.* at 588–89.

Here, just as in *Carter*, the officers expressed interest in entry to write a citation, and plaintiff held open the door and did not expressly refuse the officers entry. Instead, she walked away to retrieve an item and did not object when the officers began to follow, so the officers could reasonably understand they had implied consent to enter as would any ordinary caller. Therefore, plaintiffs' arguments regarding reasonableness of the initial entry fail.[12]

---

[12] It is true a consenting person has the right to withdraw consent and define the scope of consent. *See generally Florida v. Jimeno*, 500 U.S. 248 (1991). Nonetheless, after the officers were lawfully in the home, the officers could reasonably believe child abuse was regularly occurring in the home based on their observations. Consequently, even if plaintiff later effectively withdrew her consent, there were then exigent circumstances permitting the officers to remain.

The Court further finds that the degree of the intrusion was reasonably related to the scenario. Plaintiff was detained only for a short period that defendants describe as a "few minutes" [Doc. 334-2 p. 13] and that plaintiffs describe as "15 minutes" without citation to the record [Doc. 348 pp. 15–16]. Regardless, there is no dispute that Mrs. Pethtel was handcuffed for this brief period and that the handcuffs were removed when she was calm [Doc. 334-2 p. 29]. Thus, this seizure was limited in time to the duration of the perceived threat to officer safety and ended upon the termination of that threat.

Further, the record shows the means used were the least intrusive available as Mrs. Pethtel had previously disregarded the officers' pleas to calm down [*Id.* at 13]. Having attempted other methods, the officers' decision to handcuff Mrs. Pethtel was determined as the next logical step. The Sixth Circuit has stated that "[i]f a subject is unarmed, but nonetheless presents a risk to officer safety, handcuffing and detention in a cruiser may still be reasonable." *Kowolonek v. Moore*, 463 F. App'x 531, 536 (6th Cir. 2012). Here, Mrs. Pethtel was not even taken to a different location or placed in a police vehicle. The Court thus finds that the degree of the intrusion was therefore reasonable as a matter of law.

Further, defendants argue they are entitled to qualified immunity [Doc. 336 p. 35]. When a defendant raises qualified immunity, "the burden is on the plaintiff to demonstrate that the official[ is] not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). Plaintiffs must show: (1) "facts which, when taken in the light most favorable to [the plaintiff], show that the defendant-official's conduct

23

violated a constitutionally protected right"; and (2) "that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right." *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 727 (6th Cir. 2011) (citations omitted). The order in which to address the two prongs is left to the Court's discretion. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Regarding the first prong of the analysis, for the reasons already explained, the Court finds the officers' brief detention of Mrs. Pethel was reasonable and therefore did not violate her constitutional rights. Nevertheless, the Court will turn to the second prong of the analysis and consider the state of the law at the time of Mrs. Pethel's seizure.

To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The legal propositions are considered in light of the specific context of the case, not at higher levels of generality. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). For example, "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). While the standards need not be so specific as to be directly on point, courts should look to precedent that is "'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation omitted). "The law is clearly established when the plaintiff can point either to 'cases of controlling authority in his jurisdiction at the time of the incident' or 'a consensus of cases of persuasive authority

24

such that a reasonable officer could not have believed that his actions were lawful.'" *Kent v. Oakland Cnty.*, 810 F.3d 384, 395 (6th Cir. 2016) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate. . . . In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White*, 137 S. Ct. at 551 (citations and internal quotation marks omitted).

Here, the Court finds that based on the arguments and precedent set forth in the briefing, plaintiffs have not identified cases that clearly established the rights they claim were violated.[13] Plaintiffs' cases regarding the sanctity of the home [Doc. 348 p. 14] are too general, and plaintiffs provide no cases that state a *Terry* stop may not occur once an officer is lawfully inside a home. While plaintiffs argue that particular facts, even if unsupported by the record, demonstrate Mrs. Pethtel's lack of consent or objection to the officers' presence later in the day, plaintiffs do not cite cases that reflect upon the sequence of events at the door. Based on the case law as described above, the officers reasonably could have believed their behavior was lawful.

---

[13] In a section discussing qualified immunity as to all claims in the case, plaintiffs cite cases generally for the propositions that the Fourth Amendment protects against unreasonable searches and seizures, the Fourth Amendment applies to social workers, and children are entitled to these protections [Doc. 348 pp. 34–35]. These cases do not directly address the particular issues upon which the officers seek qualified immunity and therefore are not sufficiently particularized to the facts of this case. *White*, 137 S. Ct. at 551–52.

25

Accordingly, the Court finds that plaintiffs have failed to meet their burden as to either prong of the qualified immunity analysis. Defendants are therefore entitled to summary judgment on this claim.

### b. Seizure of Pethtel Parents in Their Home

The complaint states that "Kathleen Pethtel was detained by Anderson County Sheriffs by and through Officer Jonathan Acker in a back room of the home," the parents "were detained in separate rooms in their own home," and that Mr. Pethtel "arrived home and was forbidden entrance into his own home for approximately forty-five (45) minutes by several officers of the Anderson County Sheriff's Department by and through Josh Cardwell, Steven Abner, Wiley Maloney, Wally Braden and Joseph Gilvin, and Investigator Harold James Crowley" [Doc. 6 ¶¶ 6, 8]. There are then two seizures with which plaintiffs take issue: (1) keeping Mr. Pethtel out of the home; and (2) keeping plaintiff parents separate within the home.

The Court finds that as to Mr. Pethtel being detained separately in the home, no particular defendants have been alleged to be involved. The sequence of events in paragraph six of the complaint is somewhat unclear, but the Court assumes the detention of Mrs. Pethtel by Acker is the separation of the parents to which plaintiffs refer. Regarding the alleged exclusion of Mr. Pethtel from his home, the Court will assume *arguendo* that each of defendants were involved. Accordingly, the only claims pleaded with specificity that warrant a continued analysis are the seizure of Mrs. Pethtel separately in the back of her home by Acker and the seizure of Mr. Pethtel outside of the home by the previously-

26

listed defendants. Even if plaintiffs had adequately alleged facts as to each defendant to comply with *Lanman*, all claims still fail.

Defendants attached state criminal trial testimony where Mr. Pethtel described the sequence of events: He returned home to find his "entire driveway filled with vehicles from the Anderson County Sheriff's Department," he parked his car and "walked up and . . . addressed one of the officers [whose name he did not know, and the officer] told [Mr. Pethtel] to go back and wait in [his] vehicle. So [he] did" [Doc. 334-4 p. 7]. Mr. Pethtel then waited in his vehicle for forty-five minutes, told an officer it was "really cold out and [he] would really like to sit in [his] house and [the officer] finally let [him] go sit in [his] house" [Doc. 334-5 p. 4]. Defendants state that Mr. Pethtel does not allege that he was prevented from leaving the property [Doc. 336 p. 20]. When Mr. Pethtel re-entered the house, he said the officer placed him in a room [Doc. 334-5 p. 12].

Defendants argue that these alleged seizures are analogous to *Terry* stops based on reasonable suspicion that child abuse was occurring, that the detentions were reasonable, and that such claims are *Heck*-barred. *See generally Terry*, 392 U.S. 1; *Heck v. Humphrey*, 512 U.S. 477 (1994).

Defendants state that the specific and articulable facts giving rise to their suspicion are the bruising on the child's body, the child's sudden change in clothing, and the mother's behavior in response to questioning [Doc. 336 p. 21]. Mr. Pethtel at trial acknowledged that it made sense that the officers did not want a suspect roaming around a potential crime

27

scene [Doc. 334-5 p. 13]. The officers allowed Mr. Pethtel to wait outside in his vehicle, and inside, the parents were free from restraints [*Id.* at 4–6].

Plaintiffs respond that defendants "cite[] no authority to support the proposition that police may stop and frisk and [sic] individual in his own home based on the same indications of criminality that would allow the detention elsewhere" as *Terry* was created to allow police to detain individuals on the street [Doc. 348 pp. 18–19]. Further, plaintiffs highlight the importance of the home in Fourth Amendment jurisprudence and cite pertinent cases [*Id.*]. *See, e.g.*, *Silverman v. United States*, 365 U.S. 505, 511 (1961).

Plaintiffs state that reasonable suspicion "must rest on specific facts—available to the officers *before* they initiate contact—tending to show that the person stopped is in fact the person wanted in connection with a criminal investigation," *Hudson*, 405 F.3d at 438, and that defendants have not stated any facts that support plaintiff parents had committed or would commit child abuse [Doc. 348 p. 19]. Plaintiffs posit that the only available facts were bruising on one child's face, which the mother explained resulted from a bicycle accident [*Id.* at 19–20].

Plaintiffs further argue that the detention in separate rooms was not brief and instead actually took over five hours and that defendants do not articulate facts supporting the long detention [*Id.* at 17]. Plaintiffs contend some deputies should have remained at the home while others obtained a warrant [*Id.* at 18].

The Court finds that the detentions were reasonable as a matter of law, and regardless, the officers are entitled to qualified immunity. As discussed above, defendants

28

in fact had reasonable suspicion that plaintiff parents were specific persons wanted in connection with abuse. Based on the numerous 911 calls, extensive bruising on the children, sudden change of clothing, and erratic behavior of Mrs. Pethel, defendants could reasonably suspect someone in the home was harming the children. Though the officers received an alternative explanation of a bicycle accident, the officers could reasonably believe this was a cover story to protect the abuser. Plaintiffs provide no authority to support that the officers were required to accept their explanation. Also, as noted, the officers took into account Mrs. Pethel's behavior in following the child into the back room and then creating tension by escalating the situation. The basis of the seizures therefore was proper.

Similarly, the intrusions were reasonably related in scope to the situation at hand. While the detention took place over a period of hours, it was nonetheless reasonable. A *Terry* stop must be temporary and "last no longer than is necessary to effectuate the purpose of the stop. . . . While there is 'no rigid time limitation on the lawfulness of a *Terry* stop,' [the Court] must 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Davis*, 430 F.3d at 354 (citations omitted).

Here, the trial testimony shows that the officers called DCS and the children then ran out the back of the house toward the creek, the officers and Mrs. Pethel had to gather the children and bring them back to the house, the children had to change into dry clothes, and DCS representatives spoke with the children [*See generally* Doc. 334-2]. During the

29

investigation, Mr. Pethtel arrived home, waited in his car, and eventually waited in one of the children's bedrooms until the children were gone, at which point he talked to Cynthia Koehler from DCS [Doc. 334-5 pp. 4–6]. Numerous events happened during this period, all which required plaintiff parents' separation from the children and a continued detention for the purpose of investigation. While longer than a typical *Terry* stop, the Court finds that these detentions lasted no longer than necessary to effectuate the purpose of the detentions as they ended when the children were removed from the home and thus the potential threat to the children evaporated. Further, nothing suggests that the detentions were overly intrusive. The evidence shows that plaintiff parents were instructed to remain in particular locations, but there is no evidence of physical contact, restraints, excessive surveillance, or other intrusions. Being reasonable in scope, the *Terry* stops were proper, and no constitutional violations occurred.

For the same reasons, defendants are entitled to qualified immunity as plaintiffs have failed to meet their burden as to the first prong. But plaintiffs also have not identified legal authority that clearly establishes defendants' actions were constitutional violations. Plaintiffs argue that defendants have not offered case law to justify a *Terry* stop inside a home, but plaintiffs mistake the burden. Plaintiffs—not defendants—are required to demonstrate such a stop was clearly impermissible. General arguments regarding the "very core" of Fourth Amendment jurisprudence do not meet the required level of specificity that is required. *See White*, 137 S. Ct. at 552. As previously stated, "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help

30

in determining whether the violative nature of particular conduct is clearly established."

*Ashcroft*, 563 U.S. at 742. Considering that "immunity protects 'all but the plainly incompetent or those who knowingly violate the law'" and plaintiffs offer no "existing precedent [that places] the statutory or constitutional question beyond debate," plaintiffs fail to meet their burden on the second qualified immunity prong as well. *White*, 137 S. Ct. at 551 (citations omitted).

Defendants are protected by qualified immunity for these reasons and are entitled to summary judgment. Having found defendants acted reasonably and alternatively are entitled to qualified immunity, the Court declines to address their argument that *Heck* bars plaintiffs' claims.

### c.    Wrongful Search

Defendants argue that *Heck v. Humphrey* bars plaintiffs from claiming an unlawful search of their home because their convictions for child abuse have not been overturned, and they cannot prove an actual, compensable injury [Doc. 336 pp. 23–24]. The complaint states

> Plaintiff Tobias Pethtel's home was searched by state actors Harold James Crowley, Josh Cardwell, Steven Abner, Wally Braden, Wiley Maloney, Jonathan Acker, Joseph Gilvin and other officers from the Anderson County Sheriff's Department and DCS by and through Cynthia Koehler and Samantha Cardwell in November 2009 without Plaintiff Pethtel's permission . . . [and] without probable cause or a court-issued warrant

[Doc. 6 ¶¶ 352(d)(4)–(5)].

In *Heck*, the Supreme Court held that "[i]n order to recover compensatory damages, . . . the § 1983 plaintiff must prove not only that the search was unlawful, but that it caused

31

him actual, compensable injury . . . which . . . does *not* encompass the 'injury' of being convicted and imprisoned (until his conviction has been overturned)." 512 U.S. at 487 n.7. The Sixth Circuit held that this language "plainly refutes the argument that Fourth Amendment claims are exempted from the requirement that a conviction must be set aside as a precondition for this type of § 1983 suit." *Schilling v. White*, 58 F.3d 1081, 1086 (6th Cir. 1995).

Defendants argue that because plaintiffs "cannot show their convictions for child abuse have been 'reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus' and they can prove no other actual, compensable injury," summary judgment is appropriate [Doc. 336 p. 24 (quoting *Heck*, 512 U.S. at 487)].

Plaintiffs respond that "the Plaintiffs have not had, and will never have a Habeas Corpus action" [Doc. 348 p. 21] and rely upon *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592 (6th Cir. 2007). Defendants reply that plaintiffs have not presented evidence that they are habeas-ineligible [Doc. 352 p. 16]. The documents attached to plaintiffs' memorandum state that plaintiffs were sentenced to a term of eleven months and twenty-nine days of probation [Doc. 348-2 pp. 3, 10].

Writing in concurrence to the judgment in *Heck*, Justice Souter noted that the Court's decision would not preclude a § 1983 suit when the plaintiff could not have had his conviction impugned through habeas relief because the plaintiff received a short term

32

of imprisonment, probation, or parole. *Heck*, 512 U.S. at 497–500 (Souter, J., concurring). While the circuits are split on whether Justice Souter's limitation to *Heck* stands as law, the Sixth Circuit has adopted Justice Souter's approach. *Powers*, 501 F.3d at 600–03. In *Powers*, the Sixth Circuit determined that "a § 1983 plaintiff is entitled to a *Heck* exception if the plaintiff was precluded 'as a matter of law' from seeking habeas redress, but not entitled to such an exception if the plaintiff could have sought and obtained habeas review while still in prison but failed to do so." *Id.* at 601. Thus, the relevant inquiry is not whether § 1983 plaintiffs are currently incarcerated but whether the plaintiffs "lack a habeas option for the vindication of their federal rights." *Id.* at 603.

Although plaintiffs may contend that habeas relief was not available, terms of probation qualify as "custody" for purposes of habeas relief. *McVeigh v. Smith*, 872 F.2d 725, 727 (6th Cir. 1989); *see Parvin v. Campbell*, 641 F. App'x 446, 448, 450 (6th Cir. 2016) (affirming the lower court's dismissal of a plaintiff's claims pursuant to *Heck* where he was sentenced to six months of probation).

Here, then, plaintiffs "could have sought and obtained habeas review" while serving probation but failed to do so. *Powers*, 501 F.3d at 601. Plaintiffs are therefore not eligible for the *Heck* exception set forth in *Powers*, and plaintiffs' reliance on *Powers* is misplaced. Plaintiffs have not demonstrated they were habeas-ineligible, and because they are accordingly unable to prove an actual, compensable injury or that their convictions have been overturned, defendants are entitled to summary judgment on this claim.

33

### 3. Claims by All Plaintiffs

#### a. Due Process and Equal Protection

The portions of the complaint detailing the claim for violations of plaintiffs' procedural and substantive due process and equal protections rights do not list any defendants by name and instead generally refer to "state actors" and "private persons" [Doc. 6 ¶¶ 352(e)–(g)]. Moreover, plaintiffs' briefing on these claims cites absolutely no evidence specifying particular improper conduct of any specific defendant, including in its sole citation to evidence, namely document 348–11. Defendants are therefore entitled to summary judgment on these claims. *See Lanman*, 529 F.3d at 684.

#### b. Second Amendment

Plaintiffs' complaint makes several allegations that various defendants violated their Second Amendment rights but only one specific to the Anderson County defendants: Paul White made comments that plaintiff Tobias Pethtel was always armed while knowing he had a concealed weapons permit [Doc. 6 ¶ 471]. Plaintiffs note that defendants "manipulated interrogations and fabricated evidence, knowing that this evidence would be used against Mr. Pethtel in a felony trial, and knowing that the criminal felony charge would prevent him from exercising his right to carry a firearm" [Doc. 348 p. 31]. Further, plaintiffs aver that Mr. and Mrs. Pethtel were not permitted to enter the DCS office with sweaters in the winter and that defendants' actions caused others to "disparage the Pethtels despite their right to bear arms" [*Id.* at 32].

34

The Court finds that defendants are entitled to summary judgment on this claim for the same reasons as the Court's previous order [Doc. 324 pp. 30–32]. General comments or questions about Mr. Pethtel's firearm ownership or possession do not infringe on his right to bear arms [*Id.*]. Restrictions in the DCS office and on firearm ownership by felons are valid; though, they are irrelevant at this stage because the DCS is no longer a defendant [*Id.* (discussing that these restrictions are permissible and do not violate the Second Amendment and that to the extent the response attempts to allege malicious prosecution, plaintiffs may not amend the complaint at this stage)]. Most importantly, plaintiffs cite no evidence to support their Second Amendment claim. Accordingly, defendants are entitled to summary judgment on this claim.

## III. Motion to Dismiss – Anderson County CASA Defendants

### A. Legal Standard

Anderson County CASA and Diane Renfroe bring their motion to dismiss pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6).[14] Federal Rule of Civil Procedure 8(a) sets out a liberal pleading standard. To survive a motion to dismiss, a complaint need contain only a "'short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give [the opposing party] fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

---

[14] Plaintiffs seem to question whether Defendants' motion is instead a motion for judgment on the pleadings or for summary judgment [Doc. 359 pp. 10–11]. This contention is meritless as defendants' motion is clear that it is a motion to dismiss and defendants cite no extraneous evidence as would be required for a motion for summary judgment. Consequently, the Court will treat this motion as a motion to dismiss and therefore will only consider the allegations in the complaint.

(quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  This is to "avoid situations . . . wherein the pleading is so verbose that the Court cannot identify with clarity the (claims) of the pleader and adjudicate such (claims) understandingly on the merits."  *Harrell v. Dirs. of Bureau of Narcotics & Dangerous Drugs*, 70 F.R.D. 444, 446 (E.D. Tenn. 1975).  Detailed factual allegations are not required, but a party's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions."  *Twombly*, 550 U.S. at 555 (internal quotations omitted).  "[A] formulaic recitation of the elements of a cause of action will not do," nor will "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

In deciding a Rule 12(b)(6) motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citation omitted).  This assumption of factual veracity, however, does not extend to bare assertions of legal conclusions.  *Iqbal*, 556 U.S. at 679.  And a court is not "bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible

claim for relief will . . . be a context-specific task that requires th[e Court] to draw on its judicial experience and common sense." *Id.* at 679.

The Court will evaluate defendants' motion pursuant to these standards.

### B. Analysis

CASA defendants move to dismiss all potential claims asserted against them [Doc. 344]. As with the prior motions to dismiss, defendants noted "it is very difficult to decipher from the Amended Complaint what claims are directed to which defendants" [Doc. 345 p. 9]. They therefore addressed the claims they understood to be potentially asserted against them. As will be explained below, plaintiffs fail to state a claim as to CASA defendants for many of the same reasons as they failed to state a claim as to the other defendants whose motions were decided in November 2020 [Doc. 324]. The Court therefore frequently refers to its prior ruling. There, the Court

> explicitly addresse[d] all arguably viable claims. By negative inference, some claims [were] not addressed because either a party ha[d] been dismissed in its entirety for another reason, or the claim as alleged in the claim chart, response to a motion, or otherwise [was] dismissed as insufficient to state a claim as to other defendants for the reasons explained

[*Id.* at 12]. In this case, the Court will address defendants' arguments as to the remaining claims. The Court also notes defendants' arguments regarding qualified immunity, *respondeat superior*, and collateral estoppel [Doc. 345], but the Court finds it unnecessary to address these arguments because the claims must be dismissed for other reasons discussed below.

37

### 1. Americans with Disabilities Act ("ADA")

In the section of the complaint titled "ADA Title II: State and Local Government Activities," plaintiffs state, "Defendants violated [M.M.P.'s] ADA rights as follows below" and that "CASA was talked to by Angela Blevins, GAL for M.M.P. and was informed that her behavior toward a handicapped child was inappropriate causing M.M.P. embarrassment and invasion of her privacy by talking to doctors and talking to M.M.P. without her legal counsel present" [Doc. 6 ¶¶ 527, 529(gg)]. The Court notes this language is unclear as it asserts other persons talked to CASA, an entity, about its behavior. Nonetheless, regardless whether the claim is against either of CASA defendants, it must be dismissed.

Title II of the ADA prohibits public entities from discriminating against disabled individuals, stating "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A public entity is defined as "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)–(B). Accordingly, the "proper defendant is that 'entity.'" *Williams v. McLemore*, 247 F. App'x 1, 8 (6th Cir. 2007) (citation omitted).

Defendants correctly state CASA is not a public entity and that Renfroe is therefore not a public employee [Doc. 345 p. 42]. Even if she were, though, the claim against

38

Renfroe must be dismissed because the ADA applies to employers, places of public accommodation, and organizations and therefore "does not permit public employees or supervisors to be sued in their individual capacities." *Williams*, 247 F. App'x at 8 (citations omitted). Because plaintiffs bring this action under *respondeat superior* [Doc. 6, Parties, ¶ 11], and Renfroe has not violated the ADA, there is no basis for liability against CASA either. The ADA claims against CASA defendants must therefore be **DISMISSED**.

### 2. Section 1985 Claim

Defendants move to dismiss plaintiffs' civil conspiracy claims under 42 U.S.C. §§ 1985(3)[15] and 1986 [Doc. 345 p. 40]. The Court finds that the claims must be **DISMISSED** for the same reasons articulated in the Court's November 2020 Order [Doc. 324 pp. 18–20].

### 3. Section 1983 Claims

#### a. First Amendment

##### (1) Free Exercise of Religion

Plaintiffs fail to state a claim as to free exercise of religion under the First Amendment. Plaintiffs allege violations against CASA only, stating "CASA's report states: 'CASA feels Mr. Pethtel is a very disciplined, task oriented person whose faith and Biblical beliefs guide his motives and actions with regard to his family, specifically his children['] and 'CASA believes Mr. Pethtel believes in a very strong patriarchal dominated

---

[15] Although plaintiffs do not specify a claim under § 1985(3) and generally assert § 1985 claims, the first two sub-sections of § 1985 relating to preventing an officer from performing duties and obstruction of justice are inapplicable here.

family'" and "CASA . . . belittled the Plaintiffs' support groups" by stating that the majority of the plaintiffs' friends were adoptive parents who homeschooled their children while "knowing that the Pethtels and their friends believe in the Biblical mandate to 'train up a child in the way he should go'" [Doc. 6 ¶¶ 441, 446]. In the second to last paragraph of this section in the complaint, plaintiffs state, "Defendants have censored Plaintiffs from expressing their religious beliefs, in violation of Plaintiff's right to the free exercise of her religious beliefs" [*Id.* ¶ 455].

The Court finds these claims must fail for the same reasons as stated in the Court's previous order [Doc. 324 pp. 33–36 (discussing that unwanted comments are insufficient to violate the First Amendment, that government compulsion or an actual burden on the exercise of religion is required, and that claims of censorship were insufficiently supported)]. The complaint nowhere details particular actions of CASA defendants that burdened plaintiffs' free exercise of religion. Consequently, plaintiffs have failed to state a free exercise claim, and such claims must be **DISMISSED**.

### (2)     Establishment Clause

The Court finds that plaintiffs fail to state a claim under the Establishment Clause. The relevant portion of the complaint states, "Defendant's [sic] actions had no valid secular purpose, conveyed a message of disfavor to Plaintiff and similarly situated religious persons in the community, and further, excessively entangled the Defendants with religion by deciding which religion is acceptable and which is not, in violation of Plaintiff's [sic]

40

rights" [Doc. 6 ¶ 458]. This allegation is a legal conclusion the Court need not accept, and it does not give any indication as to which defendants allegedly violated the Establishment Clause. Consistent with the Court's prior order [Doc. 324 pp. 5–12], the Court finds the complaint does not state a claim regarding an Establishment Clause violation as to particular defendants and that it fails to place defendants on notice of what the claim is and the grounds upon which it rests. *Twombly*, 550 U.S. at 555. Therefore, any Establishment Clause claim must be **DISMISSED**.

### (3)    Free Speech

Defendants move to dismiss any free speech claim [Doc. 345 p. 38]. The complaint mentions various events in the passive voice, for example, "[t]he children were denied modest clothing" and "were allowed to view" certain material [Doc. 6 ¶ 425]. Additionally, the complaint states, "Defendants ridiculed Plaintiffs, specifically, for their religious references and prevented them from expressing their personal beliefs about religion" [*Id.* ¶ 426].

Plaintiffs fail to state a claim for a violation of their rights to free speech because they do not allege specific ways CASA defendants restricted their speech or compelled them to speak. While the Court must take factual allegations as true, a party's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal quotations omitted). Plaintiffs do not allege any actions by defendants that require or prohibit speech.

41

Further, the claims fail for the same reason as the Establishment Clause claims: The complaint does not reference CASA defendants specifically in this section; it only refers to defendants as a whole, which fails to put them on notice. Accordingly, plaintiffs fail to state a free speech claim, so the free speech claims must be **DISMISSED**.

### b. Fourth Amendment

Defendants move to dismiss any Fourth Amendment claim against them. The unlawful search and/or seizure portion of the complaint does not mention CASA defendants [Doc. 6 ¶ 352(c)]. Consequently, any alleged claims against CASA defendants under the Fourth Amendment must be **DISMISSED**.

### c. Procedural Due Process and Equal Protection

The section of the complaint alleging "Procedural Due Process Violations" names no specific defendants, including CASA defendants [Doc. 6 ¶ 352(e)]. Such claims are insufficient as discussed in the Court's November 2020 order [Doc. 324 p. 22 n.15]. Equally, the section detailing plaintiffs' equal protection claim does not list any defendants by name, instead referring to "state actors and private persons" [Doc. 6 ¶ 352(g)(5)]. This section is insufficient as explained in the Court's November 2020 order.[16] Accordingly, these claims will be **DISMISSED**.

---

[16] "Plaintiffs also use 'state actors' as a term without clearly defining it. . . . [The complaint] does not specify a definition that 'state actor' as used in the complaint will be defined as [particular] defendants but is an allegation toward listing the elements of a § 1983 claim. . . . Additionally, this follows the same problem as the general use of 'defendants' as not all defendants have performed such action, and state actors could thus not possibly refer to all listed state actors." [Doc. 324 p.7 n.7].

### d.    Substantive Due Process

In a section titled "actions under the color of state law," plaintiffs allege defendants' acts violated their substantive due process right to "familial and parental relationships" and cite several Supreme Court cases about the right generally [Doc. 6 ¶¶ 330–32].   The complaint states that defendants "violated the statutory and constitutional rights of the Plaintiffs and clearly established law" [*Id.* ¶ 334].  In the section entitled "Substantive Due Process Violations," the complaint states that plaintiffs have rights "to be free from unwanted intrusion into their protected relationships" and that the acts and omissions of state actors and agencies attempted to influence their family relationships [*Id.* ¶ 352(f)].

Here, any interference with the parent-child relationship was performed by the juvenile court, not CASA defendants.  The Sixth Circuit has held that because "the juvenile court has the ultimate decision-making power with respect to placement and custody, it alone could deprive [plaintiff] of his fundamental right."  *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 729 (6th Cir. 2011).[17]  Therefore, the complaint fails to state a plausible claim for relief as to interference with plaintiffs' family relationships, and these claims must be **DISMISSED**.

---

[17]  *Pittman* applied Michigan law, but the Sixth Circuit has stated that "[t]here can be no doubt that Tennessee law vested the juvenile court with the ultimate decision making authority concerning the issuance of such ex parte orders of immediate removal and temporary placement," so the same principle applies here. *Young v. Vega*, 574 F. App'x 684, 690 (6th Cir. 2014), *abrogated on other grounds by Turner v. Lowen*, 823 F. App'x 311 (6th Cir. 2020).

43

## IV.    Supplemental Jurisdiction

While a district court has supplemental jurisdiction over state law claims forming "part of the same case or controversy" as claims over which the court exercises original jurisdiction, a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which the court has original jurisdiction.  28 U.S.C. § 1367(a), (c)(3); *see also Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) ("If the federal claims are dismissed before trial, the state claims generally *should* be dismissed as well" (emphasis added) (citation omitted)).  Because the Court in this opinion will dismiss all of plaintiffs' claims arising under federal law, it will also **DISMISS without prejudice** plaintiffs' remaining state law claims.

## V.    Conclusion

For the reasons set forth above, defendants' motion for summary judgment [Doc. 334] and motion to dismiss [Doc. 344] are hereby **GRANTED**, and plaintiffs' motions to delay ruling [Doc. 346 p. 3] and for additional discovery [Doc. 366] are hereby **DENIED**.  All federal claims against defendants will be **DISMISSED with prejudice**; all state claims will be **DISMISSED without prejudice**.  Consequently, plaintiffs' outstanding motions [Docs. 365, 366, 367, 372, 373] are **DENIED AS MOOT**.  A separate order will follow.

ENTER:

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

44